1: 16-cv-4439

# CONFIDENTIAL

# TO BE FILED UNDER SEAL

# DO NOT PLACE ON PACER

# DO NOT PLACE IN PRESS BOX

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

NOV 30 2016

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA and
THE STATES OF GEORGIA, FLORIDA,
and TEXAS ex rel. Robert W. Douglas

Plaintiffs,

v.

CARE PLUS MANAGEMENT, LLC;
PREMIER CHOICE BILLING, LLC;
HEXIT, INC. f/k/a/ RADAR
HEALTHCARE PROVIDERS, INC.;
JOHN R. MORGAN MD;
GEORGIA MEDICAL AND
ANESTHESIA SERVICES, LLC;
PAUL D. WEIR;
VWTW, LLC;
JEFFREY WILLIAMS, MD;
ETX, LLC;
AND JOHN DOES (1-30); AND

AC ANESTHESIOLOGY, LLC;
ATHENS GASTROENTEROLOGY
ASSOCIATION, P.C.;
ATHENS GASTROENTEROLOGY
ENDOSCOPY CENTER, INC.;
ATHENS VASCULAR SURGERY, LLC;
AU ANESTHESIOLOGY, LLC;
CF ANESTHESIA, LLC;
DC ANESTHESIA, LLC;
DEKALB ENDOSOCOPY CENTER, LLC;
DEKALB GASTROENTEROLOGY
ASSOCIATES II, LLC;
DEKALB GASTROENTEROLOGY
ASSOCIATES III, LLC;
EXCEL ANESTHESIA, LLC;
FOOT & ANKLE CENTER OF MIDDLE
GEORGIA, LLC;
FOOT & ANKLE OF WEST GEORGIA,
P.C.;
GASTROENTEROLOGY SPECIALISTS
OF DEKALB, LLC;
GEORGIA SURGICARE, LLC;

Civil Action No:

Hon.:        1: 16 - CV - 4439

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. §3730(b)(2

DO NOT PLACE IN PRESS BOX

DO NOT ENTER ON PACER

JURY TRIAL DEMANDED

1

GP ANESTHESIOLOGY, LLC;
INDEPENDENT ANESTHESIA, LLC;
LC ANESTHESIOLOGY, LLC;
MIDDLE GEORGIA
ANESTHESIOLOGY, LLC;
NORTHEAST GEORGIA
ANESTHESIOLOGY, LLC;
PEACH STATE SURGICAL CENTERS,
INC.;
RG ANESTHESIA, LLC;
ROME GASTROENTEROLOGY
ASSOCIATES, INC.;
SC ANESTHESIOLOGY, LLC;
SG ANESTHESIA, LLC; SOUTHERN
ENDOSCOPY SUITE, LLC;
SOUTHERN GASTROENTEROLOGY
ASSOCIATES, L.L.C.;
TC ANESTHESIA, LLC;
THE FOOT & ANKLE SURGERY
CENTER, L.L.C.;
THE ROME ENDOSCOPY CENTER,
INC.; UNIVERSITY SURGICAL
ASSOCIATES OF ATHENS, PC;
AND JOHN DOES 31-60,
(collectively, "Georgia Entities"); AND

AMBULATORY ANESTHESIA
SERVICES, PLLC;
DIGESTIVE HEALTH SPECIALISTS
ENDOSCOPY, PLLC;
DIGESTIVE HEALTH SPECIALISTS OF
TYLER LLP;
INDEPENDENT ANESTHESIA, LLC, (a
Georgia LLC authorized to do business in
Texas—see above);
AND JOHN DOES 61-90 (collectively,
"Texas Entities"); AND

CAROLINA DIGESTIVE DISEASE, P.A.;
CATAWBA GASTROENTEROLOGY,
PA;
CATAWBA GASTROENTEROLOGY
LAND, LLC;
LC ANESTHESIOLOGY, LLC, (a Georgia
LLC authorized to do business in South
Carolina—see above);

2

PALMETTO ENDOSCOPY SUITE, LLC;
SC ANESTHESIOLOGY, LLC, (a Georgia
LLC authorized to do business in South
Carolina—see above);
AND JOHN DOES 91-120 (collectively
"South Carolina Entities"); AND

EXCEL ANESTHESIA, LLC (a Georgia
LLC authorized to do business in
Alabama—see above);

GASTRO CARE, P.C.;
TC ANESTHESIA, LLC, (a Georgia LLC
authorized to do business in Alabama—see
above);
GASTROENTEROLOGY
CONSULTANTS OF TUSCALOOSA,
INC.;
AND JOHN DOES 121-150; (collectively,
"Alabama Entities"); AND

7 HILL GASTROENTEROLOGY, P.A.;
CF ANESTHESIA, LLC, (a Georgia LLC
authorized to do business in FLORIDA—
see above);
CENTRAL FLORIDA ENDOSCOPY &
SURGICAL INSTITUTE OF OCALA,
LLC;
GASTRO CARE ASSOCIATES, LLC;
AND JOHN DOES 150-175; (collectively,
"Florida Entities"), jointly and severally,

Defendants.

## FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

### FILING UNDER SEAL

1.     This case is being filed under the qui tam provisions of the federal False Claims

Act ("FCA"), 31 U.S.C. §3730(b), which allows a private person to sue on behalf of the United

States (the "Government") for a violation of the False Claims Act. Supplemental counts under

3

parallel State False Claims Act containing equivalent qui tam provisions are also included under the False Claims Acts of the States of Georgia, Texas and Florida (the "States").

2.     This Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders. The Government and/or the States may elect to intervene and proceed with the action within sixty (60) days after it receives the Complaint.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States. The Court has supplemental jurisdiction over the State counts pursuant to 28 U.S.C. §1367 because they are part of the same case and controversy as the federal claims.

4.     Defendants transact business and/or reside in this District. Therefore, the Court has personal jurisdiction over Defendants. Further, personal jurisdiction and venue are proper in this District pursuant to 31 U.S.C. §3732(a).

5.     Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) and (c), because Defendants are subject to personal jurisdiction and transact business in this District.

## INTRODUCTION

6.     This is an action for damages and civil penalties brought by Relator on behalf of the United States of America and the States arising from the Defendants' violations of:

A.     The Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

B.     Georgia Taxpayer Protection False Claims Act, codified at 23-3-120 TO 23-3-127 (as amended Ga. L. 2013, p. 141, § 23/HB 79) and Georgia State False Medicaid Claims Act, codified at 49-4-168 TO 49-4-168.6 (as amended Ga. L. 2013, p. 141, § 49/HB 79)

4

C.     Texas Medical Assistance Program, Damages and Penalties, codified at Human Resources Code § 32.039 (as amended through Acts 2007, 80th leg., Ch. 127); Texas Medicaid Fraud Prevention (including actions by private persons), codified at Human Resources Code §§ 36.001 et seq. (as amended through Acts 2013, 83nd Leg., Ch. 1311); and Texas Award for Reporting Medicaid Fraud, Abuse, or Overcharges, codified at Government Code §§ 531.101 et seq. (as amended through Acts 2003, 78th Leg., Ch. 198).

D.     Florida False Claims Act, Fla. Stat. Ann. Title 6 §§68.081-68.092.

7.     The Defendants also conduct business in the states of South Carolina and Alabama and submit false claims to the Medicaid programs of each of those States. Neither of these two States has qui tam provisions in their false claims acts, but because Medicaid is a program jointly funded by the United States and each state, each false claim submitted by the Defendants in each of those States is a false claim against the United States for the federal share of the claimed amount, in violation of the False Claims Act, 31 U.S.C. § 3729, et seq.

8.     In Georgia, the federal government pays for approximately sixty-eight percent of all Medicaid health care services. *See* Notice, 80 Fed. Reg. 227 (Nov. 25, 2015), Table 1—Federal Medical Assistance Percentages and Enhanced Federal Medical Assistance Percentages, Effective October 1, 2016-September 30, 2017 (Fiscal Year 2017). Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under both the federal FCA and the Georgia State False Medicaid Claims Act.

9.     In Texas, the federal government pays for approximately fifty-six percent of all Medicaid health care services. *Id.* Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under both the federal FCA and the Texas State False Medicaid Claims Act.

5

10.     In Florida, the federal government pays for approximately sixty-one percent of all Medicaid health care services. *Id.* Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under both the federal FCA and the Georgia State False Medicaid Claims Act.

11.     In Alabama, the federal government pays for approximately seventy percent of all Medicaid health care services. *Id.* Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under the federal False Claims Act.

12.     In South Carolina, the federal government pays for approximately seventy-one percent of all Medicaid health care services. *Id.* Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under the federal False Claims Act.

13.     Defendants' unlawful acts in violation of the federal and State FCAs, as alleged below, concern their submission of false claims to federal and state health care programs in a scheme by which Defendant Care Plus Management, LLC ("CPM") obtains referrals of anesthesia services through the payment of kickbacks to referrers; in this instance, the referrers are gastroenterology doctors ("GIs"), vascular surgeons, podiatrists, and a few others who do surgeries at and have ownership in ambulatory surgical centers ("ASCs") in which CPM provides anesthesia services.

14.     Relator is a former Senior Vice President and Chief Operating Officer of CPM. He has direct and independent knowledge of the false claims submitted and is an "original source" of this information within the meaning of 31 U.S.C. §3730(e)(4)(B).

15.     CPM pays kickbacks to the referrers through two modalities:

6

A.  CPM forms sham joint ventures ("JV") with the referring physicians through which it pays kickbacks for the referrals disguised as "profits." Sham joint ventures have been the topic of significant OIG guidance, as discussed herein.

B.  CPM pays subsidies for anesthesia drugs and supplies to the referring physicians. Payments for drugs and supplies to a referral source have been the subject of numerous enforcement actions in this and other Districts. See, e.g., *United States and State of Georgia ex rel. Adam Nauss v. Sweet Dreams Nurse Anesthesia, et al.*, 5:14-CV-330 (Sweet Dreams agreed to pay a monetary settlement to resolve allegations that it violated the False Claims Act and the Georgia False Medicaid Claims Act when it provided free anesthesia drugs to ASCs in exchange for the ASCs giving exclusive contracts to provide anesthesia services at those ASCs.).

16.    CPM's purpose for paying kickbacks is to induce referrals for services reimbursed by government programs.

17.    As required by the FCAs, Relator voluntarily submitted to the Government and the States prior to the filing of this complaint a confidential written disclosure statement (subject to the attorney-client and common interest privileges) containing all material evidence and information in his possession pertaining to the allegations contained in this Complaint.

## BACKGROUND: PHYSICIANS, ASCs, MONEY FLOW, AND OIG GUIDANCE

### The Specialty Physician/Surgeon

18.    This case involves physicians who control referrals of anesthesia because they are not only the treating physician of the patient who is slated to receive surgery, but also the surgeon who conducts the surgery, as well as the surgeon who owns the ASC in which the patient receives the surgery.

19.     The specialty physicians at issue here are primarily gastroenterologists or "GI" doctors, who focus on the digestive system and conduct surgical procedures particular to that specialty, such as colonoscopies, endoscopies, and sigmoidoscopies; but there are other specialties also involved in the fraud, as further described below.

## The Practice of Anesthesiology

20.     Anesthesiology is a practice of medicine dedicated to the relief of pain and total care of the patient before, during and after their surgery. Anesthesiologists ("MDAs") are medical doctors who serve a central role in the operating room and make decisions to protect and regulate critical life functions.

21.     Certified Registered Nurse Anesthetists (CRNAs) are advanced practice nurses who also administer every type of anesthetic, work in every type of practice setting, and provide care for every type of operation or procedure. CRNAs provide anesthetics to patients in collaboration with and under the supervision of a medical doctor; typically, an MDA trained in anesthesia.

## The Advent of ASCs

22.     The anesthesia services at issue in this case are performed in ASCs owned and controlled by the GI and other specialty doctor/surgeons. An understanding of how these doctors came to control the ASCs is important.

23.     Historically, the surgical procedures at issue here were performed in hospitals, rather than private offices, because the use of anesthesia required the safeguards of a hospital setting equipped to handle emergencies or surgical complications. Over the last thirty years, however, surgical techniques and technology improvements made it viable to increasingly conduct these surgeries in outpatient facilities.

8

24.     In 1970, these developments led to the birth of the Ambulatory Surgical Center (ASC) concept. Today, according to the Centers for Disease Control and Prevention, nearly two-thirds of all surgeries are performed in ASCs. There are estimated to be over five thousand ASCs across the United States.

### The Problem and the Response: Self-Referral and Anti-Kickback Laws

25.     The moment that the specialists stood to financially profit from ownership in ASCs, physician ownership of ASCs exploded, particularly in specialties that perform surgical procedures, such as gastroenterology, which now accounts for nearly two-thirds of all procedures performed in ASCs in the United States. Indeed, by 2010, ninety (90) percent of ASCs were owned by physician/surgeons who self-refer.

26.     Like hospitals, ASCs receive a *facility fee* from payors, which compensates the ASC (and its owners) for use of the ASC. Because the facility fee is ancillary revenue to the ASC owner/surgeon it incentivizes the ASC owner (who is also the referring physician) to conduct patient procedures there, rather than in a regular hospital.

27.     The physicians/surgeons who conduct the surgery also receive a *professional fee* from payors, which compensates them for the personal services performed by them in connection with the surgery.

28.     The individual physician defendants in this case, excluding John R. Morgan, MD, are GI physicians, vascular surgeons, or podiatrists with ownership interests in ASCs as further detailed in this complaint. These physicians are not only the referrers of their patients for surgery but also the surgeons who perform the surgery and the surgeon/owners of the facility in which they perform the surgery.

9

29.     Recognizing the inherent conflict of interest that was created (a driver of inappropriate use of services/self-referrals in ASCs), the Legislature sought to undo the problem in two ways:

A.     It passed a series of laws beginning in 1989 with the "Stark Law" to regulate self-referrals of "Designated Health Services." See 42 U.S.C. 1395nn.

B.     It passed the Patient Protection and Affordable Care Act ("PPACA"), H.R. 3590, Section 6001, Pub. Law No. 111-148, 111 Congress 2010, which curtailed growth in physician ownership of surgical facilities by prohibiting both the creation of new and the expansion of existing physician-owned outpatient facilities. For additional information on this topic, please see Nancy Baum, *Physician Ownership in Hospitals and Outpatient Facilities*, Center for Healthcare Research and Transformation (July 2013), which is attached as Exhibit 1.

30.     The fraud in this case does not involve Stark per se because anesthesia is not a Designated Health Service as defined by Stark, but it does involve a related statute— the Anti-Kickback Statute—which incorporates numerous Stark provisions and which also prohibits referrals which are induced through the payment of a financial incentive.

## Money Flow: The Facility Fee

31.     Medicare pays ASCs a facility fee which compensates the ASC (and its owners) for the use of the ASC. The facility fee covers overhead costs, such as equipment, space, support staff, and anesthesia drugs and supplies. This fee is sometimes referred to as the "technical component" of a claim (a bill) for surgery to Medicare.

32.     Centers  for  Medicare  and  Medicaid  Services  ("CMS")  sets  Medicare reimbursement rates for facility fees, with different rate schedules for different facility types and procedures.

33.     Because  the  facility  fee  is  a  revenue  source  to  the  ASC  owner/surgeon,  it incentivizes the ASC owner (who is also the referring physician) to conduct patient procedures there, rather than at a regular hospital. As previously explained, the surgeon owners profit from the facility fees, an inherent conflict of interest sought to be remedied prospectively by PPACA.

34.     The PPACA allowed existing physician-owned hospitals to continue if they already had a Medicare provider agreement in place as of December 31, 2010, as is the case with the ASCs at issue in this case. Thus, the focus of this lawsuit is not the facility fee generated by the physician referrals, but rather the anesthesia fee generated by kickbacks to the referring physicians.

### Money Flow: The Professional Fee to the Surgeon

35.     Medicare also pays a professional fee to the physician/surgeon who conducts the surgery, which compensates for the personal services performed by the surgeon in connection with the surgery. The focus of this lawsuit is not the surgeon professional fee.

### Money Flow: The Professional Fee to the Anesthesiologists and the Center of Fraud

36.     Medicare also pays a professional fee to the MDAs and CRNAs who provide the anesthesia services in connection with the surgery, which compensates the MDA and/or CRNA for the personal services performed by them in connection with the surgery.

37.     Anesthesia professionals are in separate independent professional relationships from the surgeon. The surgeon is not entitled to a share of the anesthesia professional services fee, even though it is the surgeon that refers the services.

38.     It is this anesthesia professional fee that is the focus of the lawsuit.

11

39.    Over time, the specialty physicians who controlled surgical referrals of their patients (to their own ASCs), as well as the referrals of anesthesia services for those same patients, sought ways to profit from those anesthesia referrals. Simply put, these specialty physicians felt entitled to capture any revenue generated by "their" patients, "their" surgeries, and "their" ASCs, including the anesthesia revenue.

40.    Consequently, an extensive and systematic "shake-down" of anesthesiologists and CRNAs ensued in this space, whereby the referring-physician-ASC owners demanded a portion of the anesthesia revenue—a kickback—in exchange for "their" anesthesia referrals at "their" ASCs. *See* Exhibits 2A and 2B (American Association of Nurse Anesthetists ("AANA") letter to the OIG explaining the shake down of anesthesia professionals and the creation of "company model" schemes to cover up the kick-backs and American Society for Anesthesiologists ("ASA") letter to the OIG explaining how anesthesia joint venture schemes not only increase health care expenditures but also negatively impact patient safety).

41.    The ASA has expressed concern that the anesthesia arrangement at issue "stifles the anesthesiologists' exercise of independent medical judgment with the insistence that cases be performed with anesthesia, without regard to medical necessity for anesthesia" which not only drives up medical costs but also negatively impacts patient care. *See* Exhibit 2B at Pg. 15.

42.    Furthermore, the ASA reports increased anesthesia utilization rates in practice arrangements using the joint venture scheme at issue. In some instances "ASCs have in fact increased from 45-60% utilization rates to nearly 100% once referring physicians are capturing the anesthesia revenue stream." *See* Exhibit 2B at Pg. 17. ASA's conclusions are supported by CMS data which confirms an increased use of anesthesia services for the two procedures most performed by GI doctors in ASCs: endoscopies and colonoscopies; specifically, CMS data shows that in parts

12

of the country where anesthesia schemes are not being reported, anesthesia services for these two procedures "occurs as little as 1.6 to 8 percent of the time" compared to "an astounding 64-81.73 percent of the time" in areas where similar joint venture schemes are reported. *See Id.*

43.     While the specialty of anesthesiology has resisted this shake-down and sought fraud enforcement against it, several anesthesia companies willing to "pay to play" have sprung up, including CPM.

## THE FRAUD

### Fraud Modality One: The Sham Joint Ventures Generally

44.     CPM's joint venture scheme is straightforward. The principals of CPM approach physicians either individually or in a physician practice group, who control anesthesia referrals and own ASCs and convinces them to enter into a joint venture for anesthesia services with CPM by showing them how much money they can make on anesthesia through a joint venture with CPM.

45.     A company owned by CPM by the name of Hexit, Inc. (f/k/a/ Radar Healthcare Providers, Inc. and hereinafter referred to as "Radar") assists CPM in identifying and recruiting physician practice groups for the joint venture schemes. Radar recruiters are paid by a commission by CPM based on a pay structure established by Paul Weir.

46.     Radar wears multiple hats. It is a medical staffing company which recruits CRNAs and other medical staff for the joint ventures, it is a promoting company for CPM's joint ventures, and it provides logistical support to the joint ventures (e.g., set-up, drug ordering and delivery, etc.)

47.     Once physicians go into joint ventures with CPM, they are encouraged to recruit additional members in a type of pyramid scheme which allows the physician promoters to profit

13

from any joint ventures they generate. *See* Exhibit 3B-D at ¶ 5 (Non-compete and non-solicitation agreement).  (Individual physicians "will solicit prospective entities to do business with [JV] and/or the Company [CPM]").

48.     For example, based on the success of JV1, the referring physician/ASC owner of JV1, Dr. Jeffrey Williams, MD (in conjunction with Dr. John Morgan), created ETX, LLC for the purpose of recruiting additional physician joint venturers.

49.     For each potential joint venture, CPM gets details from the referring "partner" for the total number of cases expected and the payor mix at the ASC and uses those details to prepare projections for the potential "partners" regarding how much money they would make from anesthesia if they entered into the joint venture.

50.     Each referral source ends up with a joint venture anesthesia company dedicated to that referral source's ASC (as opposed to a joint venture that provides services to the entire community). As discussed below, the referral partners were not allowed to compete with CPM.

51.     As part of the joint venture, the ASC is required to enter into an anesthesia agreements with CPM (or a CPM company) which cedes control over the entire JV anesthesia operation to CPM, exactly as it would be the case if CPM simply entered into a direct anesthesia agreement with the ASC without the joint venture.

52.     CPM then provides all the management, staffing, and billing for the joint venture's operations at the ASC. *See* Exhibit 4, Pro-forma Operating Agreement.

53.     The joint ventures were and are nothing more than a method for CPM to lock up referrals and pay a kickback for such referrals, the very thing the OIG warned against in 2003 and again in 2012, as further detailed below.

**The Promoters of the Joint Venture Scheme: CPM-related Defendants**

54.     The entities driving the joint venture scheme are Care Plus Management, LLC, Dr. John R. Morgan, M.D. and his company Georgia Medical and Anesthesia Services, LLC; Paul D. Weir and his company VWTW, LLC; Dr. Jeffrey Williams, MD and his company ETX, LLC; and Hexit, Inc., f/k/a/ Radar Healthcare Providers, Inc.

55.     Defendant Care Plus Management, LLC is a Georgia limited liability company that provides anesthesia management and recruitment services for ASCs in Georgia, Texas, South Carolina, Alabama, and Florida. CPM was formed on February 1, 2010. At that time, the registered agent was Defendant John R. Morgan, MD. The principal mailing address was 1071 Lancaster Court, Bogart, GA, 30622 ("Bogart, GA address").

56.     CPM's office moved in 2011 to 2470 Daniells Bridge Rd, Building 100, Suite 141, Athens, GA, 30606 ("Athens, GA address).

57.     CPM's current principal office address is 1741 Hog Mountain Road, Building 200, Watkinsville, GA, 30677 ("Watkinsville, GA address").

58.     Defendant Premier Choice Billing, LLC is a Georgia limited liability company that provides billing services for CPM related companies. It was formed on March 12, 2014. The current principal mailing address is identical to CPM's Watkinsville, GA address.

59.     Defendant Hexit, Inc. is a Georgia profit corporation formed as Radar Healthcare Providers, Inc. on February 16, 2010. The name change was recorded on August 24, 2016. Radar Healthcare Providers, Inc. promotes joint ventures and recruits medical staffing for the joint ventures between CPM and ASCs. The current principal office address is PO Box 6566, Athens, GA 30604.

60.     Defendant John R. Morgan, MD is a Board-Certified, Internal Medicine physician actively licensed in the State of Georgia who is based in Athens, Georgia. He is a Principal of

15

Defendant CPM, the registered agent of Defendant ETX, LLC, and the owner of Defendant Georgia Medical and Anesthesia Services, LLC.

61.    Defendant Georgia Medical and Anesthesia Services, LLC is a Georgia limited liability company formed on June 29, 2011. At that time, the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

62.    Defendant Paul D. Weir is a Principal of Defendant CPM and the owner of Defendant VWTW, LLC. He is not a physician, but is a former Director for a national anesthesia management and recruiting firm with offices in six states.

63.    Defendant VWTW, LLC is a Georgia limited liability company owned by Defendant Paul D. Weir. It was formed February 11, 2010. The current principal office address is identical to CPM's Watkinsville, GA address.

64.    Defendant Jeffrey Williams, MD is a Board-Certified Gastroenterologist actively licensed in the State of Georgia based in Athens, Georgia. Defendant Jeffrey Williams, MD, owns Athens Gastroenterology Association, PC, Athens Gastroenterology Endoscopy Center, Inc., and is a co-owner of ETX, LLC with Defendant John R. Morgan, MD.

65.    Defendant ETX, LLC ("ETX") is a Georgia limited liability company that promotes joint ventures between CPM and physician owned ASCs. It was formed on March 3, 2011. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

## Structural and Operational Components of the Joint Ventures

16

66.     The structural components and documents for each JV are materially identical. Pro-forma documents used by CPM with all ASCs and/or physician groups are attached. *See* Exhibit 4, Pro-forma Operating Agreement ("Operating Agreement") and Exhibit 5A, Pro-forma Exclusive Agreement for Anesthesia Services ("Anesthesia Agreement").

67.     Each joint venture is governed by an **Operating Agreement**. *See* Exhibit 4. At the outset, CPM acknowledges in each JV Operating Agreement that what it is doing is legally questionable, albeit it purports to fix this problem by stating that it "intends" to conduct its business in a manner that does not violate the AKS by not billing federal programs unless its "satisfied" that its operations fully meet a safe harbor. *See* Exhibit 4, at ¶ 3.1, Operating Agreement.

ARTICLE III
BUSINESS OF COMPANY

3.1 Permitted Businesses. The business of the Company shall be:

(a) To provide professional anesthesiology services to ambulatory surgical centers and other medical providers (**At the outset of its business, it is acknowledged by the Members that a level of uncertainty exists concerning Federal Anti-Kickback regulations, safe harbors, and safeguards in its area of practice,** but the Company intend to conduct its business in a manner that does not violate the Federal Anti-Kickback Statute; therefore, whereas the Company will be providing services to patients covered by Federal health care programs from its origination, the Company will not bill any Federal health care program for services provided unless the Company is satisfied it fully meets a safe harbor or verified safeguards.)

(emphasis added).

68.     The joint venturers membership interest is standardized across the JVs and is 51/49 CPM/referrer entity which typically is an ASC. However, the pro-forma operating agreement indicates a 60/40 membership interest CPM/ASC. *See* Exhibit 4 at Pg. 26 (Exhibit "B"), Operating Agreement.

69.     The initial capital contribution is less than or equal to $1.00 by each forming party. *See* Id.

17

70.     Except for the initial capital contribution, "no Member shall be required to make any Capital Contributions." *See* Exhibit 4 at Pg. 10 (Section 8.2), Operating Agreement.

71.     The joint ventures presented zero risk to anyone, least of which the referring joint venture partner which provided nothing to the joint venture other than patients.

72.     During the start-up phase and pending the flow of insurance money for each joint venture, the initial operations of each joint venture were financed entirely through a line of credit ("LOC") in the name of the joint venture, which was always paid off the moment insurance money began to come in (which was abundant) no later than six months from the beginning of each JV's operations.

73.     Each JV provides professional anesthesiology services to the affiliated ASC. *See* Exhibit 4 at Pg. 2 (Section 3.1(a), Operating Agreement.

74.     Net profits of each JV are "made to the Members and Economic Interest Owners pro rata in accordance with their respective Economic Interests." *See* Exhibit 4 at Pg. 10 (Section 9.1), Operating Agreement.

75.     Each JV and the ASC also enter into a **Provider Agreement** for anesthesia services. The pro-forma agreement is "Exclusive," although some JV iterations eliminate the exclusivity language from the provider agreement. Note that regardless of the iteration, the JV is the de facto exclusive anesthesia provider at each ASC partner. *See* Exhibit 5A Anesthesia Agreement. ("NEW ANESTH" in the pro-forma anesthesia services agreement is the pro-forma name for the JV between CPM and the affiliated ASC. "GASTRO" in the same document is the pro-forma name for the affiliated referring physician group).

18

76.    Pursuant to the Provider Agreement, each JV became the "provider of Professional

Services" to the ASC's "employed or contracted physicians." *See* Exhibit 5A at Section 1,

Anesthesia Agreement.  Per the Anesthesia Services Agreement:

> "Professional Services" means, except as otherwise provided by [ASC's] policies,
> services of a Provider in the practice of anesthesiology, including, without
> limitation, the performance of accepted procedures commonly used to render
> patients insensitive to pain during the performance of pain producing clinical
> measures and to relieve pain associated with medical syndromes and life-support
> functions associated with such services.

*See* Exhibit 5A at Section 3.6, Anesthesia Agreement.

77.    Under the Provider Agreement, the ASC partner (the referrers) delegates all

operational responsibilities to the JV, including developing a staffing plan and the scheduling of

professional services; maintenance of CRNA certifications, licensure, and liability insurance; and

developing quality improvement and risk management programs. *See* Exhibit 5A at Section 4,

Anesthesia Agreement:

### RESPONSIBILITES OF NEW ANESTH

4.1    Staffing Plan and Scheduling of Professional Services: **NEW ANESTH**
shall provide coverage and the services of Providers at **GASTRO** during the times
described in the staffing plan . . . **NEW ANESTH** shall, in its judgment, retain and
schedule a sufficient number of Providers to be expediently available at **GASTRO**
. . .

4.2    Provider Qualification: At all times during the term of this Agreement,
**NEW ANESTH** shall ensure that:

> 4.2.1 Each provider shall (a) hold a current valid and unlimited license to
> practice nursing in the state of South Carolina with appropriate certification
> in the provision of anesthesia; . . . (e) maintain current ACLS, and (f)
> maintain a **$1,000,000/ 3,000,000** malpractice policy.

4.3    Continuous quality improvement and risk management: In conjunction with
**GASTRO**'s overall quality improvement and risk management programs, **NEW
ANESTH** will develop and recommend procedures designed to achieve
consistency and quality of the Professional Services provided by Providers.

19

*See* Exhibit 5A at Section 4, Anesthesia Agreement.

78. Additionally, under the Provider Agreement, each JV agrees to pay for all the anesthesia drugs and supplies of the affiliated ASC and, moreover, to pay the affiliated ASC rent to store the ASC's supplies. To wit, Section 4.5 provides the following:

> **NEW ANESTH** Drugs and Supplies. If requested by **GASTRO** in the performance of its professional Services, **NEW ANESTH** will reimburse **GASTRO** for the anesthetic drugs or purchase the drug separately and reimburse **GASTRO** for cost of secure storage.

See Exhibit 5A at Section 4.5, Anesthesia Agreement.

79. The JVs pay for all the drugs and supplies of each ASC partner as a matter of course, even though the ASC are already reimbursed for such drugs and supplies as part of the global fee paid to the ASC by Medicare.

80. The payments for drugs and supplies are kickbacks for anesthesia referrals.

81. In return for the foregoing, each affiliated ASC and its owner referrers refer all of their anesthesia services exclusively to the affiliated JV.

82. CPM shares the anesthesia profits of each JV with its referring partners.

83. These "profits" are kickbacks for anesthesia referrals.

84. CPM requires the referring JV partners to sign a **Non-compete and Non-solicitation Agreement**. *See* Exhibit 3A-D, Non-compete and non-solicitation agreement.

85. The Non-Compete Non-Solicitation Agreement recognizes that the sham JV "utilizes the specialized business plan of the Company [CPM]" and prohibits the referring physician group from using the scheme without CPM. *See* Exhibit 3A at ¶ 6, Non-compete and non-solicitation agreement. *See also* Exhibit 3B-D at ¶ 6, Non-compete Non-solicitation Agreement ("[referring doctor] will obtain specific insight into the operations and business model of the Company [CPM]"). Further, referring doctors agree not to:

a. run, own, manage, operate, control, be employed by, provide consulting services to, be a manager of, participate in, lend his name to, invest in or be connected in any manner with the management, ownership, operation or control of any business, venture, governmental or quasi-governmental agency or activity that (A) competes with the business or any part thereof as conducted by the Company [CPM]; or (B) in any way performs any activity or service that is the same as or similar to the type conducted, authorized offered, or provided by the Company within two (2) years prior to disassociation with the Company [CPM]

\*      \*      \*

b. undertake the planning or organization of any business activity competitive with the Company [CPM] that will engage in any activity or service that is the same as or similar to the type conducted, authorized, offered, or provided by the Company [CPM]

*See* Exhibit 3A at ¶ 6(1)(a)-(b) and Exhibit 3B-D at ¶ 7(1)(a)-(b), Non-compete and Non-Solicitation Agreement.

86.     In sum, CPM did not want the physicians to learn the anesthesia business and set up their own shop to compete with CPM, further evidence that the JV was not a bona fide anesthesia company.

87.     The JV anesthesia services were staffed by CPM exclusively with CRNAs, rather than anesthesiologists, as independent contractors.

88.     The contractors presented no risk to the JVs because, as non-employees, they only got paid for what they actually worked.

89.     Each CRNA entered into an **Independent Contractor Agreement** with the JV through which the CRNA provided anesthesia services to a particular ASC, which read as follows:

LC Anesthesiology, LLC [JV] (hereinafter referred to as "Client") agrees to contract [] CRNA, (hereinafter referred to as "Contractor") beginning May 19, 2014, exclusively at Client's practice location, Catawba Gastro, LLC [ASC8] (hereinafter referred to as "Facility") located in Lancaster, SC.

21

*See* Exhibit 6 at Section 1, Independent Contractor Agreement. See also Id. at Section 4 (General Provisions), Part III ("Contractor understands that the Client and the Facility is not responsible for withholding or paying any taxes . . .").

90.     As independent contractors, the CRNAs had to "procure and maintain professional liability insurance in the amount of $1,000,000 per occurrence and $3,000,000 in aggregate." *See* Id. at Section 3, Part III.

91.     As a condition for servicing the ASCs, the CRNAs were required to **assign** their billings to each respective JV, through which CPM billed and collected anesthesia revenue from government payors.

92.     Representative of the "shake-down" to which the ASA and the AANA refer in Exhibits 2A-B, CPM payed the anesthesia staff only a fraction of the anesthesia fees CPM collected for anesthesia services from government payors (and the much higher private pay), splitting the rest amongst themselves and the anesthesia referring partners at each JV as "profits" from the joint ventures.

93.     All along, CPM billed government payors for anesthesia services (despite its pledge to not do so in the Operating Agreement).

94.     In 2011, CPM used a third-party billing company called Medical Business Solutions ("MBS") out of Perry, Georgia. The lead contact person at MBS was Rhonda Ballinger.

95.     In 2013, CPM moved its billing to two other billing companies, Integrated Practice Solutions ("IPS") and Bodhi Tree, because processing fees were lower.

96.     In 2013, CPM moved all its billing for the JVs to Premiere Choice Billing, LLC.

97.     At all times, the anesthesia providers at each ASC submitted the paper information that was the basis for the billings (e.g., the patient's name, the Place of Service ("POS"), the start

and end time of service, number of drug units used, etc.) directly to the billing company. If the ASC in question had an electronic health records ("EHR") system, the anesthesia providers submitted the encounter information electronically to the billing company. If the ASC did not have an EHR system, the billing company picked-up the paper records at the ASC.

98.     The billing company received payor remittances and in turn deposited them in the bank account for each JV.

99.     CPM managed the books for each JV (money in and money out) using QuickBooks, an account management software suite marketed by Intuit, Inc. and made periodic distributions to themselves, as well as the referring JV partners.

100.    Specifically, at all times relevant to this disclosure, John R. Morgan, MD and Paul D. Weir, the principals of CPM, received distributions from the JVs individually and through their companies, Georgia Medical and Anesthesia Services, LLC and VWTW, LLC.

101.    Likewise, CPM issued distributions to each JV referring partner (the ASCs and/or their owners) on a monthly basis, leaving in each joint venture account only between $20,000 and $30,000 for cash flow for the next billing cycle.

102.    By way of illustration, in January of 2012, CPM's internal documents reported that JV1 (noted as "NEGA" on the Exhibit) paid $270,000 in profit distributions to CPM (which received $137,700) and to ASC1s owners Dr. Jeffrey Williams (noted as "JW" on the Exhibit who received $66,150) and Dr. Asif Qadri (noted as "AQ" on the Exhibit who received $66,150). *See* Exhibit 7 at January Distributions (page first) and at Year-to-Date Distributions (page last), Spreadsheet of distributions to the joint venture partners.

103.    Similar distributions of profits were made every single month in 2012 resulting in $2,564,600 in total profit distributions. CPM received $1,307,946 in distributions. Dr. Williams received $628,327, and Dr. Qadri received $628,327. *Id.*

104.    In July of 2012, the seventh month after JV2 was formed, CPM's internal documents reported that JV2 (noted as "SC" on the Exhibit) paid $45,000 in profit distributions to CPM (which received $22,950) and to ASC2 (noted as "Palmetto" on the Exhibit which received $22,050). Similar distributions of profits were paid every subsequent month in 2012 resulting in $478,000 in total profit distributions. CPM received $243,780.00 and ASC2 received $234,220.00. *See* Id. at July Distributions and at Year-to-Date Distributions (last page).

105.    In January of 2012, CPM's internal documents reported that JV3 (noted as "IA" on the Exhibit) paid $83,000 in profit distributions to ETX, LLC (which received $49,800.00) and to ASC3 (noted as "Ambulatory" on the Exhibit) owners Dr. Richard Seidel, MD and his practice group (who received $32,200). Because JV3 was one of Dr. Williams-generated joint ventures, the profits were distributed to ETX (CPM and Williams's company) and ASC3, (rather than CPM directly and ASC3). In point of fact, from January to October of 2012, JV3 distributed the $971,200.00 in "profit" distributions to ETX in the amount of $550,482 (70/30 CPM/Williams)) and to ASC3 in the amount of $420,718.00. *See* Id at January Distributions (first page) and at Year-to-Date Distributions (last page).

106.    In January of 2012, CPM's internal documents reported that JV4 (noted as "GP" on the Exhibit) paid $81,000 in profit distributions to ETX, LLC (which received $41,310.00) and to ASC4 (noted as "Dekalb" on the Exhibit) owners Dr. Shirley Harris, MD and her practice group (who received $39,690.00). Because JV4 was one of Dr. Williams-generated joint ventures, the profits were distributed to ETX (CPM and Williams's company) and ASC4 (rather than CPM

24

directly and ASC4). In point of fact, from January to October of 2012, JV4 distributed the $947,508.00 in "profit" distributions to ETX of $483,233.00 (70/30 CPM/Williams)) and to ASC4 of $464,275.00. *See* Id.

107. Indeed, from January to October of 2012, ETX, LLC paid $1,032,647.00 in profit distributions to CPM (which received $722,852.90) and Dr. Jeffrey Williams, MD (who received $309,794.10). Care Plus Management, LLC agreed to a 70/30 money split with ETX, LLC for any joint ventures recruited by Williams. *See* Id. at Year-to-Date Distributions (last page).

108. In February of 2012, CPM's internal documents reported that FFS1 (noted as ""MGA" on the Exhibit) paid $20,000 in profit distributions to CPM (which received $15,000) and to Ausburn & Associates, LLC, (noted as "Ausburn" on the Exhibit), biller Rhonda Ballinger's company (which received $5,000). Similar distributions of profits were made quarterly in 2012, resulting in distributions to CPM of $33,750.00 and to Ausburn of $11,250.00. *See* Id at January Distributions (first page) and at Year-to-Date Distributions (last page).

109. Ninety percent of all distributions to the JV referring partners were monthly, meaning that 90% of the joint ventures were cash positive every single month after all expenses of the joint venture were paid.

110. The remaining ten percent of the JVs did not receive monthly distributions simply because they were in the start-up phase. However, all JVs became cash positive. None ever lost money.

111. In every instance, CPM was the joint venture partner that provided the anesthesia services and performed all operation and management functions, while the respective ASC partners provided nothing other than patients for whom they got paid back a portion of the profits.

112. The joint ventures are nothing more than a method for CPM to lock up referrals and pay a kickback for such referrals, the very thing the OIG warned against in 2003 and 2012.

113. A detailed list of JVs is provided starting at paragraph 145 of this complaint.

### OIG 2003 Opinion

114. The type of operation run by CPM was the subject of guidance by the OIG, which expressed concern about joint ventures when one entity is able to refer business to another that furnishes services for which the Federal health care program pays. *See* Special Advisory Bulletin, "Contractual Joint Ventures," 68 FR 23148 (Apr. 30, 2003) (Exhibit 8A).

115. In that Special Advisory Bulletin, the OIG detailed questionable arrangements where a health care provider in one line of business, such as an ASC (referenced as "owner" in the Bulletin), expands into a related health care business by contracting with an existing provider of a related item or service, such as CPM (referenced as "supplier" in the Bulletin), to provide the new item or service to the ASC's existing patient population, including Federal health care program patients.

116. The OIG pointed out that those sham ventures often involve the supplier—here, the anesthesia company—not only managing the new line of business, but also supplying it with inventory, employees, billing, and other services.

117. Exclusivity is often a requirement of the joint venture.

118. Basically, the joint venture in these sham arrangements consists of the ASC contracting out substantially the entire operation of the related anesthesia services that is the subject of the joint venture to the supplier of such services, such as CPM. The supplier would have been a potential competitor to the joint venture otherwise, but in creating these sham arrangements, the ASC receives in return the profits of the business as remuneration for federal program referrals.

26

119.    Each joint venture between CPM and a referring physician/ASC fits squarely within the parameters of the OIG advisory opinion.

120.    The referring physicians/ASC expanded into a related line of business—an anesthesia company—which is dependent on referrals from, or business generated by the referring physicians'/ASC's existing business.

121.    Similarly, the referring physicians/ASC contracted out substantially all of the operations of the new business to CPM, an anesthesia supplier already in that business.

122.    Further, CPM (directly and through related entities as detailed below) agreed to provide not only the management services, but all other necessary services to run the business, such as anesthesia personnel, billing, support, etc.

123.    Moreover, as in the OIG opinion, the referring physicians'/ASCs' actual business risk in the CPM scheme was and is minimal (if any) because the referring physicians/ASCs have a captive patient base and the sole ability to influence referrals to the new business.

124.    Indeed, CPM was assured exclusivity, contractual or de facto, through the arrangement when the JV became the exclusive provider of anesthesia services at the ASC.

125.    Further, absent the joint venture, CPM would have been a competitor of the referring physicians/ASCs new line of business.   As a result of the JV, the referring physicians/ASCs are not allowed to compete with CPM or the JV. *See* Exhibit 3A-D Non-compete and non-solicitation agreement.

126.    As in the OIG opinion, the referring physicians/ASCs and CPM share in the economic benefit of the new joint venture because the anesthesia provider takes its share in the form of payments under the various contracts with the ASCs and the referring physicians/ASCs receive their share from the residual profit from the new business.

27

127. Finally, the payments to the referring physicians/ASCs vary with the value or volume of business referred to CPM. The higher the referral volume, the bigger the revenue. *See* Exhibit 7 (Spreadsheet of distributions to the joint venture partners).

### OIG 2012 Opinion

128. Consistent with its earlier opinion, the OIG issued another Advisory Opinion in 2012 (No. 12-06) (attached as Exhibit 8B). There, the OIG opines on a Requestor's request for guidance regarding two proposals by an anesthesia services provider regarding entry into contracts with physician-owned professional corporations or limited liability companies to provide anesthesia services.

129. The Requestor inquired whether the proposed business arrangements constituted grounds for sanctioning under the exclusion authority at section 1128(b)(7) of the Social Security Act (the "Act"), or the Civil Monetary Penalty provision at section 1128A(a)(7) of the Act, as those sections relate to the commission of acts described in section 1128B(b) of the Act, the Federal Anti-Kickback Statute. *See* Id. at page first, ¶ 1.

130. The first proposal involved double paying physicians for facility fees by way of a per-patient management fee paid to the ASC, even though those fees were not collected from Federal health care program patients. *See* Id. at Section I(B).

131. After analyzing the first proposal under the AKS's regulatory framework (discussed below), the OIG concluded that, even if federally funded patients were "carved out" of the scheme, the proposed arrangement implicates the AKS because the management fees would be paid to induce referrals. Indeed, the physician owned ambulatory surgical center would be paid twice for the same services, once from the anesthesia services company and once from the Medicare facility fee. Further, the OIG concluded that the additional compensation could unduly

influence the ASC to use the anesthesia services company as the exclusive provider of anesthesia services, which would be antithetical to the fundamental purpose of the anti-kickback statute to ensure that physician referrals are based on sound medical judgment and that health care professionals will compete for business based on quality and convenience rather than by paying for referrals. In sum, the OIG concluded the arrangement implicated the AKS. *See* Id. at Section II(B)(1).

132.    The second arrangement at issue for the OIG involved physician/owners of an ASC establishing an anesthesia management company for the purpose of providing exclusive anesthesia services at the physician's ASC. *See* Id. at Section I(C).

133.    The second arrangement followed the same fate as the first —likely violations of the AKS—for different reasons; to wit, the OIG's long running concern that physician investment in ASCs where the physicians also refer patients may serve to reward referrals rather than reward sound medical judgment. In fact, when the ASC safe harbor rule was promulgated, OIG stated its main concern was that "a return on investment in an ASC might be a disguised payment for referrals." See 64 Fed. Reg. 63,536 (Nov. 19, 1999). *See* Id. at Section II(B)(2).

134.    In the arrangement under OIG review, the ASC physician owners established separate companies for the purpose of providing anesthesia-related services to outpatients undergoing surgery at their ASCs. The OIG concluded that these companies were tantamount to the sham joint venture agreements identified in the OIG April 2003 guidance.  To wit, these joint ventures were owned by the physician PCs and LLCs; the joint venture would exclusively furnish and bill for all anesthesia-related services provided at the surgical centers; and the joint venture would, in turn, engage the anesthesia service provider ("AP") as an independent contractor to

29

provide anesthesia-related services to the ASCs on an exclusive basis; all arrangement features that met the elements and characteristics of the joint venture in the 2003 guidance.

135.    More specifically, Opinion 12-06 identified services provided by the AP which are identical in substance to those services provided by CPM in this case:

a.  recruiting, credentialing, and scheduling anesthesia personnel;
b.  ordering and maintaining supplies and equipment;
c.  assisting the ASCs in selecting and working with a reputable anesthesia billing company;
d.  monitoring and overseeing regulatory compliance;
e.  providing financial reports;
f.  implementing quality assurance programs; and
g.  providing logistics (including, if necessary, assisting the ASCs in structuring independent contractor or employment relationships with anesthesia personnel and assisting in establishing a separate anesthesia corporation).

*See* Id. at Section I(C).

136.    In this second proposed arrangement, the ASC would pay a negotiated rate for the services. This is tantamount to what each ASC pays each CPM joint venture in this case.

137.    The fees for the services in the second proposed arrangement would be paid out of the collections made by the joint venture for anesthesia-related services, with the joint venture retaining any profits, exactly as is the case with CPM's joint ventures.

138.    The OIG noted that no safe harbor would apply because such payment on the profits would be prohibited under the anti-kickback statute if one purpose of that remuneration is to generate or reward referrals for anesthesia services. *See* Id. at Section II(B)(2).

139.    OIG further opined that this second proposed arrangement posed more than a minimal risk of fraud and abuse. As discussed previously regarding OIG's guidance on joint ventures, the OIG has long-standing concerns about arrangements between those in a position to refer business, such as the ASC physician-owners here, and those furnishing items or services for

which Medicare or Medicaid pays, especially when all or most of the business of the joint venture is derived from one or more of the joint venturers. *See* Id.

140.     The OIG recognized that this arrangement shared several common elements with the suspect joint venture arrangements previously analyzed in the Special Advisory Bulletin on "Contractual Joint Ventures." See 68 Fed. Reg. 23,148 (Apr. 30, 2003) (the "Special Advisory Bulletin"). Like the Owner in the arrangement described in the April 2003 Special Advisory Bulletin, the ASC's physician-owners would be expanding into a related line of business—anesthesia services—that would be wholly dependent on the ASC's referrals.

141.     The ASC's physician-owners would not actually participate in the operation of the joint venture but rather would contract out substantially all of the operations exclusively to the anesthesia services provider. And like the Owner in the Special Advisory Bulletin in 2003, the ASC's physician-owners' actual business risk would be minimal because they would control the amount of business they would refer to the joint venture.

142.     In light of the foregoing, the OIG concluded that these arrangements are designed to permit the ASC's physician-owners to do indirectly what they cannot do directly; that is, to receive compensation, in the form of a portion of anesthesia service revenues, in return for their referrals to the anesthesia services provider.

143.     The OIG's conclusion was further supported by the Requestor's claim of market pressure (from the ASCs) to enter into the Proposed Arrangements in order to compete with other anesthesia groups in the area who engaged in similar schemes, exactly as is the case with CPM. *See* Id. at Section I(A). In other words, the anesthesia provider in the proposed arrangement must "pay to play" or lose the ASC's business, as is the case with CPM.

31

144.     This case fits squarely within the parameters outlined by the OIG in its multiple guidance opinions. CPM is that provider of anesthesia services which has entered into sham joint ventures with its referral sources in order to lock in a stream of anesthesia referrals and disguise the payment of kickbacks to those providers as profits of the joint venture in violation of the OIG guidance opinions, the AKS, and the False Claims Act, as further detailed below.

## The Joint Ventures

### JV1:

145.     Defendant Northeast Georgia Anesthesiology, LLC is a Georgia limited liability company and a joint venture ("JV1") between CPM, ETX, and Athens Gastroenterology Endoscopy Center, Inc ("ASC1").

146.     JV1 was formed March 29, 2010. At that time, the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

147.     Defendant Athens Gastroenterology Endoscopy Center, Inc. ("ASC1") is a Georgia profit corporation that operates as an ASC. ASC1 is owned by Drs. Jeffrey Williams, MD, and Asif Qadri, MD.

148.     Defendant Athens Gastroenterology Association, P.C. (the "Practice") is a Georgia professional corporation which is also owned by Drs. Jeffrey Williams, MD, and Asif Qadri, MD who use it to conduct their private medical practice and make referrals to JV1 and ASC1.

149.     Both the ASC1 and the JV1 referring partners are located at 3320 Old Jefferson Road, Building 400, Athens, GA 30607. For purposes of the fraud at issue in the case, the referring partners are one and the same.

### JV2:

150.   Defendant SC Anesthesiology, LLC is a Georgia limited liability company registered as a South Carolina Foreign Limited Liability Company. It as a joint venture ("JV2") between CPM and Palmetto Endoscopy Suite, LLC ("ASC2").

151.   JV2 was formed December 22, 2011. At that time, the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

152.   Defendant Palmetto Endoscopy Suite, LLC ("ASC2") is a South Carolina limited liability company that operates as an ASC. ASC2 is owned by Drs. George A. Jenkins III, MD, Spencer J. Jenkins, MD, and Daniel Tupper Iseman, MD.

153.   Defendant Carolina Digestive Disease, P.A. (the "Practice") is a South Carolina professional association which is also owned by Drs. George A. Jenkins III, MD, Spencer J. Jenkins, MD, and Daniel Tupper Iseman, MD and is used to conduct their private medical practice and make referrals to JV2 and ASC2.

154.   Both the ASC2 and the JV2 referring partners are located at 1520 Taylor Street, Suite 200, Columbia, SC, 29201. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV3:**

155.   Defendant Independent Anesthesia, LLC is a Georgia limited liability company registered with the Texas Secretary of State to transact business in Texas. It is a joint venture ("JV3") between CPM, ETX, and Digestive Health Specialists Endoscopy, PLLC ("ASC3A") and/or Ambulatory Anesthesia Services, PLLC ("ASC3B") collectively ("ASC3").

33

156. JV3 was formed March 3, 2011. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

157. Defendant Digestive Health Specialists Endoscopy, PLLC ("ASC3A") is a Texas professional limited liability company that operates as an ASC. Its principal office address is 1720 S. Beckham Avenue, Tyler, TX, 75701. ASC3 is owned by Drs. Richard H. Seidel, Jr., MD and George A. Duvall, MD.

158. Defendant Ambulatory Anesthesia Services, PLLC ("ASC3B") is a Texas professional limited liability company that operates as an ASC. ASC3 is owned by Drs. Richard H. Seidel, Jr., MD and George A. Duvall, MD.

159. Defendant Digestive Health Specialists of Tyler, LLP is a Texas limited liability partnership (the "Practice") which is also owned by Dr. Richard H. Seidel, Jr., MD and George A. Duvall, MD, and is used to conduct their private medical practice and refer to JV3 and ASC3.

160. Both the ASC3 and the JV3 referring partners are located at 1720 S. Beckham Avenue, Tyler, TX, 75701. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV4:**

161. Defendant GP Anesthesiology, LLC is a Georgia limited liability company and a joint venture ("JV4") between CPM, ETX, and Gastroenterology Specialists of Dekalb, LLC ("ASC4").

162. JV4 was formed May 12, 2011. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

34

163.    Defendant Gastroenterology Specialists of Dekalb, LLC, ("ASC4") is a Georgia limited liability company that operates both as a Practice and an ASC.

164.    Although ASC4 is not licensed as an ASC, Dr. Harris performs outpatient surgeries there. ASC4's principal office address is 3292 Mountain Drive, Decatur, GA, 30032.

165.    The Practice/ASC4 is owned by Dr. Shirley Harris, MD who uses it to it refer anesthesia cases to JV4.

**JV5:**

166.    Defendant DC Anesthesia, LLC is a Georgia limited liability company and a joint venture ("JV5") between CPM, ETX, and Dekalb Endoscopy Center, Inc.("ASC5").

167.    JV5 was formed December 3, 2014. The current principal office address is identical to CPM's Watkinsville, GA address.

168.    Defendant Dekalb Endoscopy Center, LLC ("ASC5") is not recorded as a Georgia limited liability company, though it carries the LLC designation in its name. It is identified by National Provider Identifier ("NPI") number 1497895676 as an ASC. ASC5 is owned by Dr. Mark A. Stern, MD.

169.    Defendant Dekalb Gastroenterology Associates II, LLC (the "Practice") is a Georgia limited liability company through which Dr. Mark A. Stern, MD conducts his private medical practice and refers to JV5 and ASC5.

170.    Defendant Dekalb Gastroenterology Associates III, LLC (the "Practice") is a Georgia limited liability company through which Dr. Mark A. Stern, MD conducts his private medical practice and refers to JV5 and ASC5.

35

171.   Both the ASC5 and the JV5 referring partners are located at 2675 North Decatur Road, Suite 110, Decatur, GA, 30033. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV6:**

172.   Defendant SG Anesthesia, LLC is a Georgia limited liability company and a joint venture ("JV6") between CPM and Southern Endoscopy Suite, LLC ("ASC6").

173.   JV6 was formed December 1, 2012. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Athens, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

174.   Defendant Southern Endoscopy Suite, LLC ("ASC6") is a Georgia limited liability company that operates as an ASC. ASC6 is owned by Drs. Mark Kukler, DO and Scott Schorr, MD.

175.   Defendant Southern Gastroenterology Associates, LLC ("the Practice") is a Georgia limited liability company through which Drs. Mark Kukler, DO and Scott Schorr, MD conduct their private medical practice and refer to JV6 and ASC6.

176.   Both the ASC6 and the JV6 referring partners are located at 763 Old Norcross Road, Lawrenceville, GA, 30045. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV7:**

177.   Defendant Excel Anesthesia, LLC is a Georgia limited liability company registered as an Alabama foreign limited liability company. It is a joint venture ("JV7") between CPM and Gastroenterology Consultants of Tuscaloosa, Inc ("ASC7").

36

178. JV7 was formed August 27, 2015. The current principal office address is identical to CPM's Watkinsville, GA address. Prior to JV7 being created, CPM provided non-joint venture anesthesia services to ASC7 through TC Anesthesiology, LLC, a CPM non-joint venture "fee-for-service" entity. *See* FFS2 below. JV7 succeeded TC Anesthesiology as the entity that serviced ASC7.

179. Defendant Gastroenterology Consultants of Tuscaloosa, Inc. ("ASC7") is an Alabama corporation that operates as an ASC. The ASC is owned by Dr. A.B. Reddy, MD.

180. Defendant Gastro Care, P.C. ("the Practice") is an Alabama professional corporation through which Dr. A.B. Reddy, MD, conducts his private medical practice and refers to JV7 and ASC7.

181. Both the ASC7 and the JV7 referring partners are located at 100 Rice Mine Road, Tuscaloosa, AL, 35406. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV8:**

182. Defendant LC Anesthesiology, LLC is a Georgia limited liability company registered as a South Carolina Foreign Limited Liability Company. It is a joint venture ("JV8") between CPM and Catawba Gastroenterology Land, LLC ("ASC8").

183. JV8 was formed April 4, 2014. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Athens, GA, address. The current principal office address is identical to CPM's Watkinsville, GA address.

184. Defendant Catawba Gastroenterology Land, LLC ("ASC8") is a South Carolina limited liability company that operates as an ASC. ASC8 is owned by Drs. Vimal Amin, MD, and Victor M. Amato, MD.

37

185.    Defendant Catawba Gastroenterology, PA (the "Practice") is a South Carolina professional association also owned by Drs. Vimal Amin, MD, and Victor M. Amato, MD and is used by them to conduct their private medical practice and refer to JV8 and ASC8.

186.    Both the ASC8 and the JV8 referring partners are located at 1380 Ebenezer Road, Rock Hill, SC, 29732. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV9:**

187.    Defendant RG Anesthesia, LLC is a Georgia limited liability company and a joint venture ("JV9") between CPM and The Rome Endoscopy Center, Inc ("ASC9").

188.    JV9 was formed January 30, 2014. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Athens, GA, address. The current principal office address is identical to CPM's Watkinsville, GA address.

189.    Defendant The Rome Endoscopy Center, Inc ("ASC9") is a Georgia profit corporation that operates as an ASC. ASC9 is owned by Drs. Kenn E. Griffith, MD, Louis Lataif, MD, and Roderick Remoroza, MD.

190.    Defendant Rome Gastroenterology Associates, Inc (the "Practice"), is a Georgia profit corporation also owned by Drs. Kenn E. Griffith, MD, Louis Lataif, MD, and Roderick Remoroza, MD. which is used by them to conduct their private medical practice and refer to JV9 and ASC9.

191.    Both the ASC9 and the JV9 referring partners are located at 11 John Maddox Drive Rome, GA, 30165. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV10:**

192.    Defendant AC Anesthesiology, LLC is a Georgia limited liability company and a joint venture ("JV10") between CPM and Athens Vascular Surgery, LLC ("ASC10").

193.    JV10 was formed February 10, 2012. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

194.    Defendant Athens Vascular Surgery, LLC ("ASC10") is a Georgia limited liability company that operates as an ASC. ASC10 is owned by Drs. David Sailors, MD, Jonathan Woody, MD, and Jeffrey Pearce, MD.

195.    Defendant University Surgical Associates of Athens, PC is a Georgia professional corporation also owned by Drs. David Sailors, MD, Jonathan Woody, MD, and Jeffrey Pearce, MD through which they conduct their private medical practice and refer to JV10 and ASC10.

196.    Both the ASC10 and the JV10 referring partners are located at 195 King Ave, Athens, GA, 30606. For purposes of the fraud at issue in the case, the referring partners are one and the same.

**JV11:**

197.    Defendant CF Anesthesia, LLC is a Georgia limited liability company registered as a Foreign Limited Liability Company in Florida. It is a joint venture ("JV11") between CPM and Central Florida Endoscopy & Surgical Institute of Ocala, LLC ("ASC11").

198.    JV11 was formed May 13, 2013. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Athens, GA, address. The current principal office address is identical to CPM's Watkinsville, GA address.

39

199.    Defendant Central Florida Endoscopy & Surgical Institute of Ocala, LLC ("ASC11") is a Florida limited liability company that operates as an ASC. ASC11 is owned by Dr. Vishnu Reddy, MD.

200.    Defendant 7 Hill Gastroenterology, P.A. is a Florida professional association also owned by Dr. Vishnu Reddy, MD through which he conducts his private medical practice and refers to JV11 and ASC11.

201.    Defendant Gastro Care Associates, LLC is another Florida limited liability company owned by Dr. Vishnu Reddy, MD through which he conducts his private medical practice and refers to JV11 and ASC11.

202.    Both the ASC11 and the JV11 referring partners are located at 3256 S Pine Ave, Ocala, FL, 34471. For purposes of the fraud at issue in the case, the referring partners are one and the same.

### John Doe JVs

203.    CPM, ETX, and their principals have continued to actively promote the sham joint ventures and the FFS ventures since Relator's departure from CPM. *See* Exhibit 9 identifying the eleven identified joint ventures and three fee for service entities.

204.    Upon information and belief, there are numerous other joint ventures and venturers which are materially identical in structure to those listed here by name and which are referred in this Complaint as John Does 1-175

### Modality Two of the Fraud: Subsidizing the Drugs and Supplies of the ASC

205.    In addition to forming sham JVs in order to pay kickbacks for referrals, CPM also engaged in the practice of paying for the anesthesia drugs and supplies of its referrers, regardless

of whether the referrers had joint ventures with CPM or were regular ASCs with no joint-venture relationship with CPM (the latter was referred to by CPM as "Fee for Service" clients).

206.   CPM's practice of giving referring physicians "a thing of value" in the form of anesthesia drugs, equipment, and supplies to induce patient referrals to CPM is a kickback in and on itself that violates the FCA. *See, e.g., United States and State of Georgia ex rel. Adam Nauss v. Sweet Dreams Nurse Anesthesia, et al.*, 5:14-CV-330, (Sweet Dreams agreed to pay a monetary settlement to resolve allegations that it violated the False Claims Act and the Georgia False Medicaid Claims Act when it provided free anesthesia drugs to ASCs in exchange for the ASCs giving exclusive contracts to provide anesthesia services at those ASCs).

207.   As previously explained, Medicare makes payments to ASCs for covered surgical procedures, including ASC facility services provided in connection with the covered procedure. This payment is known as the "facility fee." According to the CMS Ambulatory Surgical Center Fee Schedule, ICN 006819 (December 2015) examples of covered ASC facility fees for covered surgical procedures include:

- Nursing services, services furnished by technical personnel, and other related services;
- Patient use of ASC facilities;
- Drugs and biologicals for which separate payment is not made under the OPPS, surgical dressings, supplies, splints, casts, appliances, and equipment;
- Administrative, recordkeeping, and housekeeping items and services;
- Blood, blood plasma, and platelets, with the exception of those to which the blood deductible applies;
- Materials for anesthesia

208.   Notwithstanding their inclusion in the facility fee, CPM, directly and through the sham joint ventures, *reimburses* the ASCs the cost of the anesthesia drugs and, in at least one case, the cost of supplies.

41

209.    In the alternative, CPM, directly and through the sham JVs, purchases the anesthesia drugs and supplies directly and provides them to the ASCs.

210.    Further, CPM, through the sham JVs, agreed to pay ASC JV partners for "storage costs" for the anesthesia drugs and supplies even though these costs are the ASCs' obligation to begin with and part of the facility fee paid by Medicare. *See* Exhibit 5A at Section 4.5, Anesthesia Agreement:

> [JV] Drugs and Supplies. If requested by [REFERRING] GASTRO in the performance of its professional Services, [JV] will reimburse REFERRING GASTRO for the anesthetic drugs [i.e. propofol] or purchase the drug separately and reimburse [REFERRING] GASTRO for cost of secure storage.

211.    In addition to providing such subsidies to all of its joint ventures, CPM provided such subsidies to its Fee for Service clients, as detailed below.

212.    The structural components and documents for each FFS are materially identical.

213.    CPM and the FFS clients enter into an **Exclusive Agreement** for Anesthesia Services. *See* Exhibit 5B, AU Anesthesia, LLC Exclusive Agreement for Anesthesia Services.

214.    CPM pays for all the drugs and supplies for each FFS client as a matter of course.

215.    CPM's payment for drugs and supplies is nothing more than a method for CPM to lock up referrals and pay a kickback for same, the very thing the OIG warned against in 2012 and settled in *United States and State of Georgia ex rel. Adam Nauss v. Sweet Dreams Nurse Anesthesia, et a*l.

**"Fee-for-Service" ("FFS") (non-JVs) Clients of CPM:**

FFS1:

216.    Defendant Middle Georgia Anesthesiology, LLC ("FFS1") is a Georgia limited liability company which operates as a fee for service management agreement venture between CPM and both Peach State Surgical Centers, Inc. and The Foot & Ankle Surgery Center, L.L.C.

42

FFS1 was formed June 4, 2010. The principal mailing address was identical to CPM's Bogart, GA address. The current principal office address is identical to CPM's Watkinsville, GA address.

217.    Defendant Peach State Surgical Centers, Inc. is a Georgia profit corporation that operates as an ASC. The ASC is owned by Dr. Sarvepalli Jokhoi, DPM.

218.    Defendant Foot & Ankle Center of Middle Georgia, LLC ("the Practice") is a Georgia limited liability through which Dr. Sarvepalli Jokhoi, DPM conducts his private medical practice and refers to Defendant Peach State Surgical Centers, Inc.

219.    Both the Peach State Surgical Centers, Inc and Foot & Ankle Center of Middle Georgia, LLC referring partners are located at 1040 Morningside Drive, Perry, GA, 31069

220.    Defendant The Foot & Ankle Surgery Center, L.L.C. ("ASC6B") is a Georgia limited liability company that operates as an ASC. The ASC is owned by Dr. Alap P. Shah, DPM.

221.    Defendant Foot & Ankle of West Georgia, P.C. ("the Practice") is a Georgia professional corporation through which Dr. Alap P. Shah, DPM conducts his private medical practice and refers to Defendant The Foot & Ankle Surgery Center, L.L.C.

222.    Both The Foot & Ankle Surgery Center, L.L.C. and Foot & Ankle of West Georgia, P.C. referring partners are located at 2751 Warm Springs Road, Columbus, GA, 31904.

FFS2:

223.    Defendant TC Anesthesiology, LLC ("FFS2") is a Georgia limited liability company which operated as a fee for service management agreement venture between CPM and Gastroenterology Consultants of Tuscaloosa, Inc. This JV was formed August 4, 2014. The principal mailing address was identical to CPM's Athens, GA address. The current principal office address is identical to CPM's Watkinsville, GA address. This entity was replaced by the CPM—

43

Gastroenterology Consultants of Tuscaloosa, Inc. joint venture known as Excel Anesthesia, LLC. *See* JV7.

224.    Defendant Gastroenterology Consultants of Tuscaloosa, Inc. is an Alabama corporation that operates as an ASC. The ASC is owned by Dr. A.B. Reddy, MD.

225.    Defendant Gastro Care, P.C. ("the Practice") is an Alabama professional corporation through which Dr. A.B. Reddy, MD, conducts his private medical practice and refers to FFS2 and Gastroenterology Consultants of Tuscaloosa, Inc.

226.    Both the Gastroenterology Consultants of Tuscaloosa, Inc. and the Gastro Care, P.C. referring partners are located at 100 Rice Mine Road, Tuscaloosa, AL, 35406.

FFS3:

227.    Defendant AU Anesthesiology, LLC ("FFS3") is a Georgia limited liability company which operated as a fee for service management agreement venture between CPM and Georgia Surgicare, LLC. FFS3 was formed September 19, 2012. At that time the registered agent was Defendant John R. Morgan, MD. The principal mailing address was identical to CPM's Athens, GA, address. The current principal office address is identical to CPM's Watkinsville, GA address.

228.    Defendant Georgia Surgicare, LLC is a Georgia limited liability company that operates as an ASC. Its principal place of business in 367 Athens Highway, Loganville, Georgia. It is owned by Dr. Christopher Ibikunle, MD.

229.    Defendant John Doe 2 (the "Practice") is also owned by Dr. Christopher Ibikunle, MD and is used by him to conduct his private medical practice and refer to the Georgia Surgicare, LLC ASC.

## THE REGULATORY FRAMEWORK

**Anti-Kickback Statute**

230. In 1972, Congress enacted the federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b et seq., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government. AKS also provides that those who knowingly and willfully solicit or receive, offer or pay anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a-7b(b)(1).

231. To be a kickback, the value that is conveyed to a referrer does not need to be an outright payment to the referrer. There are many artifices by which value can be conveyed; to wit, forgiving an obligation conveys value, charging less than fair market value conveys value, providing services of anything in kind without a commensurate payment conveys value. Regardless of how value is conveyed, it is a kickback if one purpose is to induce referrals for services covered by Medicare or Medicaid. *See, e.g., United States v. Greber,* 760 F.2d 68, 69 (3rd Cir. 1985), *cert. denied,* 474 U.S. 988 (1985) (holding that under the "one purpose" test "if one purpose of the payment was to induce referrals, the medicare [sic] statute has been violated."

232. The purpose of the AKS is to protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than the cost, quality of care, or necessity of health services. Violations of AKS form a basis for False Claims Act ("FCA") liability. See 42 U.S.C. § 1320(a)-7b(g). Thus, complying with AKS is essential to protecting Medicare and Medicaid and is material to payment and participation in government-funded health care programs.

45

233. Further, upon enrollment in the Medicare program, Defendants agree to not present or cause to be presented a false claim (i.e., a claim that violates the law, including Stark or AKS):

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

CMS Form 855B, Section 15 (Certification) ¶ 6.

234. Providers must bill for anesthesia services in the CMS-1500 form, which requires the provider to certify that each bill complies with the program's requirements for reimbursement:

Because this form is used by various government and private health programs, See separate instructions issued by applicable programs.
***

Notice [as to Medicare, CHAMPUS, FECA, and Black Lung programs]: any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a crime… and may be subject to civil penalties.
****
Notice [as to Medicaid]: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under Federal or State laws.

CMS-1500 Form.

235. Thus, at enrollment and with each billing for anesthesia services, Defendants necessarily certified compliance with such laws. Those certifications were false because the services were not reimbursable as a result of the kickback scheme at issue in this case, thereby rendering each bill a false statement and a false claim for reimbursement.

## The Federal False Claim Act ("FCA")

236. A cause of action under the FCA arises when any person knowingly presents or causes to be presented a false or fraudulent claim for payment or approval by government funds. 31 U.S.C. §3729(a)(1)(A).

46

237.    A cause of action under the FCA also arises when any person knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. §3729(a)(1)(B).

238.    As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) acting with actual knowledge of the information; (ii) acting in deliberate ignorance of the truth or falsity of the information; or (iii) acting in reckless disregard of the truth or falsity of the information and that statute makes clear that it does not require proof of specific intent to defraud.

239.    In addition, the FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than $5,500 and up to $11,000 for each such claim, and three times the amount of the damages sustained by the government.

240.    The qui tam provision of the FCA empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government.

241.    An FCA complaint is filed under seal and without service on the defendants and remains under seal while the government investigates the allegations in the Complaint and determines whether to join the action.

**Materiality**

242.    Anesthesia referrals are not reimbursable by Medicare or Medicaid if the parties to the referral exchanged remuneration where one purpose of the value exchanged was to induce the referral.

243.    Violation of the anti-kickback statute is material to reimbursement and a basis for FCA liability. *See, e.g., United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 314 (3d Cir. 2011) (government does not get what it bargained for when a defendant is paid by

47

CMS for services tainted by a kickback); *United States ex rel. McNutt v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1257 (11th Cir. 2005) ("undisputed that a violator of the Anti-Kickback Statute is disqualified from participating in a Medicare program"); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 565 F.Supp.2d 153, 159 (D.D.C. 2008) ("Legion . . . cases have held [that] violations of [the] AKS . . . can be pursued under the FCA, since they would influence the Government's decision of whether to reimburse Medicare claims"). Indeed, as clarified in the Patient Protection and Affordable Care Act, P.L. 111-148, a claim filed in violation of the AKS is a false claim for purposes of the FCA. 42 U.S.C. § 1320(a)-7b(g).

### Knowledge

244.    For purposes of the FCA, a defendant is deemed to have the requisite scienter in this regard if he/she "has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" 31 U.S.C. § 3729(b)(1)(A).

245.    Defendants knew that their arrangements violated AKS.

246.    Defendants went so far as to specifically include a provision in the JV operating agreements acknowledging the problematic nature of the arrangement. *See* Exhibit 4 at Pg. 2, Section 3.1(a), Pro-forma Operating Agreement.

ARTICLE III
BUSINESS OF COMPANY
3.1 Permitted Businesses. The business of the Company shall be:

(a) To provide professional anesthesiology services to ambulatory surgical centers and other medical providers (At the outset of its business, it is acknowledged by the Members that a level of uncertainty exists concerning Federal Anti-Kickback regulations, safe harbors, and safeguards in its area of practice, but the Company intend to conduct its business in a manner that does not violate the Federal Anti-Kickback Statute; therefore, whereas the Company will be providing services to patients covered by Federal health care programs from its origination, the Company will not bill any Federal health care program

48

for services provided unless the Company is satisfied it fully meets a safe harbor or verified safeguards.)

247.    Further, Defendants knew that compliance with AKS laws is a condition of participation in and payment by the Medicare, Medicaid, and other government programs, as a result of their enrollment and periodic submission of claims to Medicare.

248.    Almost on a daily basis and amounting to hundreds of occasions, CPM principals expressly commented that the reason for the joint venture and the subsidies to referrers was to secure "their business." Clearly, therefore, one purpose for the schemes at issue in this complaint was to induce referrals for services paid by government programs.

## COUNT I

### False Claims Act - Presentation of False Claims - 31 U.S.C. § 3729(a)(1).

249.    Relator re-alleges and incorporates paragraphs 1 - 248 of this Complaint as if fully set forth herein.

250.    In performing the acts described above, Defendants through their own acts or through the acts of their officers, knowingly and/or recklessly submitted or caused to be submitted false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

251.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT II

### False Claims Act - False Statements - 31 U.S.C. §3729(a)(2).

252.    Relator re-alleges and incorporates paragraphs 1 - 248 of this Complaint as if fully set forth herein.

253.    In performing the acts described above, Defendants through their own acts or

49

through the acts of their officers, knowingly made, used or caused to be made or used, a false

record of statement to get false or fraudulent claims paid or approved by the Government in

violation of 31 U.S.C. §3729(a)(2).

254.    The United States, unaware of the foregoing circumstances and conduct of the

Defendants, made full payments which resulted in its being damaged in an amount to be

determined.

## COUNT III

### Violation of the Georgia State False Medicaid Claims Act

255.    Relator realleges and reincorporate paragraphs 1- 248 of this Complaint as if fully

set forth herein.

256.    Relator also seeks to recover treble damages and civil penalties under the Georgia

State False Medicaid Claims Act.

257.    Ga. Code Ann. § 49-4-168.1 et seq. provides liability for any person who—

> Knowingly presents or causes to be presented to the Georgia Medicaid program a
> false or fraudulent claim for payment or approval;
>
> Knowingly makes, uses, or causes to be made or used, a false record or statement
> to
> get a false or fraudulent claim paid or approved by the Georgia Medicaid program;
>
> Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent
> claim allowed or paid;
>
> Knowingly makes, uses, or causes to be made or used, a false record or statement
> material to an obligation to pay or transmit property or money to the Georgia
> Medicaid program, or knowingly conceals or knowingly and improperly avoids or
> decreases an obligation to pay or transmit property or money to the Georgia
> Medicaid program.

258.    Defendant violated Ga. Code Ann. § 49-4-168.1 and knowingly caused claims to

be made, used and presented to the State of Georgia by its violation of federal and state laws from

50

at least 2010 to the present.

259.   The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

260.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendant's fraudulent and illegal practices.

261.   Had the State of Georgia known that Defendant was violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with defendant's fraudulent and illegal practices.

262.   As a result of defendant's violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount to be determined.

263.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of himself and the State of Georgia.

## COUNT IV

### Violation of the Florida False Claims Act

264.   Relator realleges and reincorporate paragraphs 1- 248 of this Complaint as if fully set forth herein.

265.   Relator also seeks to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 et seq.

266.   West's F.S.A. § 68.082 provides liability for any person who-

51

Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

Conspires to commit a violation of this subsection.

267.   Defendant violated West's F.S.A. § 68.082 from at least 2010 to the present by engaging in the fraudulent and illegal practices described herein.

268.   Defendant furthermore violated West's F.S.A. § 68.082 and knowingly caused false claims to be made, used and presented to the State of Florida, as described herein .

269.   The State of Florida, by and through the State of Florida Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

270.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendant's fraudulent and illegal practices.

271.   Had the State of Florida known that Defendant were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendant's fraudulent and illegal practices.

272.   As a result of Defendant's violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

273.   Relator is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to West's F.S.A. § 68.083(2) on behalf of herself and the State of Florida.

## COUNT V

### Violation of the Texas Medicaid False Claims Act

274.     Relator realleges and reincorporate paragraphs 1- 248 of this Complaint as if fully set forth herein.

275.     Relator also seeks to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 et seq.

276.     V.T.C.A. Hum. Res. Code § 36.002, in relevant part, provides liability for any person who—

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received

\*          \*          \*

(6) knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

(A) is not licensed to provide the product or render the service, if a license is required; or
(B) is not licensed in the manner claimed;

(7) knowingly makes or causes to be made a claim under the Medicaid program for:
(A) a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;
(B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

\*          \*          \*

(12)     knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or

53

decreases an obligation to pay or transmit money or property to this state under the Medicaid program.

277. Defendants violated the Texas Hum Res. Code. § 36.002 from at least 2010 to the present by engaging in the fraudulent and illegal practices described herein. Defendants further violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas from at least 2010 to the present by their violation of federal and state laws, including, as described herein.

278. The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

279. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendant's fraudulent and illegal practices.

280. Had the State of Texas known that Defendant was violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Defendant's fraudulent and illegal practices.

281. As a result of Defendant's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount to be determined.

282. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of herself and the State of Texas.

54

## PRAYER FOR RELIEF

**WHEREFORE,** Relators respectfully request that this Court enter judgment against Defendants as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

b. That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relators necessarily incurred in bringing and pressing this case;

d. That Relators be awarded the maximum amount allowed pursuant to the False Claims Act;

e. That the State of Georgia be awarded damages as the Georgia State Medicaid False Claims Act provides; specifically:

   a. Three times the amount of actual damages which the State of Georgia has sustained as a result of defendant's fraudulent and illegal practices;

   b. A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which defendant caused to be presented to the State of Georgia;

   c. Prejudgment interest; and

   d. All costs incurred in bringing this action.

f. That Relators be awarded the maximum amount allowed pursuant to the Georgia State Medicaid False Claims Act;

g. That the State of Florida be awarded damages as the Florida State Medicaid False Claims Act provides; specifically:

    a. Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's fraudulent and illegal practices;

    b. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant's caused to be presented to the State of Florida;

    c. Prejudgment interest; and

    d. All costs incurred in bringing this action.

h. That Relators be awarded the maximum amount allowed pursuant to the Florida State Medicaid False Claims Act;

i. That the State of Texas be awarded damages as the Texas State Medicaid False Claims Act provides; specifically:

    a. Damages at two times the value of any payment or monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts set forth above, as provided by the Texas Human Resources Code § 36.052(a)(1) & (4)

    b. Civil penalties of $15,000 for each and every unlawful act set forth above that resulted in injury to a person younger than 18 years of age, as provided by the Texas Human Resources Code § 36.052(3)(A)

    c. Pre- and post-judgment interest, Tex. Hum. Res. Code § 36.052(a)(2),

j. That Relators be awarded the maximum amount allowed pursuant to the Texas State Medicaid False Claims Act.

k. That this Court award such other and further relief as it deems proper.

## DEMAND FOR A JURY TRIAL

Relators demand a jury trial on all claims alleged herein.

J. Marc Vezina
GA Bar No. 465449
TX Bar No. 24000114
LA Bar No. 24683
MI Bar No. P76232
Monica P. Navarro P52985
280 N. Old Woodward
Suite LL20
Birmingham, MI 48009
(248) 558-2700
jmv@vezinalaw.com
mnavarro@vezinalaw.com

57