**EXHIBIT 2A**

**COMPLAINT**



**American Association of Nurse Anesthetists**
222 South Prospect Avenue, Park Ridge, IL 60068-4001
847.692.7050

September 6, 2016

Gregory E. Demske, Esq.
Chief Counsel to the Inspector General
U.S. Department of Health & Human Services
Office of Inspector General
Room 5527, Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201
Attn: Chief, Industry Guidance Branch

Dear Mr. Demske,

The American Association of Nurse Anesthetists ("AANA") is submitting this letter of concern on behalf of the over 50,000 nurse anesthetist members (including Certified Registered Nurse Anesthetists ("CRNA") and student nurse anesthetists) it represents. Its purpose is to raise practical concerns from the industry and to bring to the attention of the Department of Health and Human Services' Office of the Inspector General ("HHS-OIG") that substantial confusion still exists related to the interplay between the "Company Model," or variations thereto, and the prohibitions created by the Anti-Kickback Statute, 42 U.S.C. §1320a-7b ("AKS").

Competitive pressures remain to enter into company model arrangements, and the AANA believes that: (1) *all anesthesia* providers would benefit from clarification of these issues; and (2) providing clarification would reduce the number of circumstances in which the prohibitions contained in the AKS are being implicated or potentially violated. More importantly, clarity on this issue would allow for a meaningful distinction to be made between those who are intent on violating the law and those who are working under a cloud of uncertainty.

This is not just a concern for CRNAs; it is an issue for *all anesthesia providers*.

On behalf of its members, the American Society of Anesthesiologists has brought this issue to the attention of DHS-OIG on multiple occasions. See http://www.asahq.org/quality-and-practice-management/practice-management/company-model. We appreciate the depth and breadth of HHS-OIG's ongoing concerns regarding the commission of fraud in healthcare. Accordingly, the AANA implores you to consider the following: *When virtually an entire industry raises concerns that the lack of clarity might be facilitating improper conduct, further clarification is warranted.*

AANA.com   Safe and effective anesthesia  for **every patien**



CRNAs want to focus on the administration of anesthesia and the welfare of their patients. CRNAs want to be free of the pressure to engage in arguably questionable arrangements as the only way to facilitate access to quality care. HHS-OIG has addressed these issues in two advisory opinions, OIG Advisory Opinion No. 12-06 and OIG Advisory Opinion No. 13-15. Both made it clear that "Company Model" arrangements "could potentially generate prohibited remuneration" under the AKS, and that HHS-OIG could not conclude that such arrangements "would pose no more than a minimal risk of fraud" under the AKS. *See OIG Advisory Opinions No. 12-06 and No. 13-15.* Those seeking to improperly profit from the administration of anesthesia are emboldened by the fundamental absence of enforcement efforts to clarify what is proper or improper in the aftermath of these Advisory Opinions.

To be clear, the AANA is less interested in the past, as substantial confusion exists as to where the lines are and what truly constitutes proper versus improper behavior. Our interest is in *clarity for the future* and the creation of a clear space in which anesthesia can be provided without concern for anything other than the welfare of the patient.

### The Company Model

While there are multiple variations of the Company Model; typically, physicians who own a facility at which they perform surgical procedures form an anesthesia company so that they can bill for the provision of anesthesia. These physicians contract with anesthesia providers and refer cases to the anesthesia provider. Upon the administration of anesthesia, the referring physician pays the anesthesia provider *a portion* of the revenues, retaining the difference as a profit.

Despite guidance from the HHS-OIG in the form of Advisory Opinions Nos. 12-06 and 13-15 that these types of arrangements implicate the AKS, there remains confusion. Circumstances continue to exist and new opportunities continue to be proposed in which physician groups bill for services being performed by anesthesia providers (CRNAs and anesthesiologists alike), pay the anesthesia provider *less* than the amount received for the services, and retain the delta between those two amounts. When resistance is offered to engage in this conduct, it is commonplace to learn that others have already agreed to such conduct or are readily available to do so. This is not due to a willingness to violate the law, but the perception that, absent any enforcement actions or clarification from HHS-OIG, the conduct is allowable.

Company Model arrangements create multiple levels of concern for CRNAs given the relaxation of intent requirements contained in the Affordable Care Act, see 42 U.S.C. § 1320a-7b(h), as they relate to violations of the False Claims Act, and the fact that *criminal liability flows in both directions* upon the payment of an improper referral in violation of AKS. These Company Model agreements present an abundance of potential for liability, and, furthermore, allow the systematic skimming of funds at the expense of anesthesia providers.

### Looking Ahead

As a result, the two advocacy organizations representing virtually all anesthesia providers find themselves seeking clarification of *where the lines are between proper arrangements and those that would violate the AKS*. We want to provide clear guidance to AANA's membership, and AANA's members want to adhere to the law. These appear to be circumstances appropriate for further clarity or the issuance of a Special Fraud Alert. Absent such a step, individuals intent upon putting profits ahead of patients will



continue syphoning off of anesthesia profits at the expense of anesthesia providers and in violation of the law.

This is not an appropriate subject for a declaratory ruling because it would not be possible to identify all of the potential variations on the Company Model, nor would it be possible to identify circumstances in which anesthesia providers could certify to their willingness to enter into these arrangements.

The benefit of and need for clarification is obvious if HHS-OIG would simply consider two practical realities:

- If it were clarified that it was improper for anyone referring covered services to retain *any* amount not directly related to the actual value of the billing services provided, any impermissible incentive would be removed.
- Clarifying this issue would protect both the legal and economic interest of all anesthesia providers by making it clear that the proverbial "shaking down" of anesthesia providers is unacceptable.

If an inherent purpose of these arrangements is not to skim from the anesthesia provider to whom services are being referred so as to provide value back to the physician group referring the business, then what is the purpose? The AKS has been interpreted to cover any arrangement in which even *one* purpose is to obtain money for the referral of services or induce further referrals. *See OIG Advisory Opinions No. 13-15*. Unless HHS-OIG takes affirmative steps to clarify these issues, the result will be increased pressure on anesthesia providers to engage in improper behavior.

Allowing the Company Model to continue unabated carries significant potential of yielding adverse impact upon the health care system. The adverse consequences that can flow from the payment of kickbacks include:

- Overutilization of anesthesia services, creating unnecessary risk;
- Influencing independent decision-making regarding the administration of anesthesia;
- Undermining patient choice and the integrity of federal healthcare programs;
- Increasing costs, thereby potentially decreasing access to care; and
- Generally placing profits ahead of patients.

Administration of anesthesia represents an undeniably important, albeit unique, element of healthcare delivery. The safe administration of anesthesia is entirely separate, but is the essential component to the performance of many procedures, surgical, invasive, and non-invasive. As a result, the administration of anesthesia will virtually always include an accompanying "referral," because anesthesia is not often administered independent of other healthcare. When the government is the payer, given that the administration of anesthesia is inextricably tied to the performance of another procedure, there is reason to evaluate compliance with the prohibition of payment for a referral under the AKS.

The AKS makes it a criminal offense to knowingly and wilfully offer, pay, solicit, or receive anything of value to induce or reward the referral of services reimbursed by a government healthcare program. The Company Model appears to be designed to allow indirectly what could not be done directly; that is, the receipt of a reward for a referral—here a portion of the revenues associated with the administration of anesthesia.



### Guidance Sought

HHS-OIG could stem this behavior by simply issuing a Special Fraud Alert making providers aware that (1) the government is aware that this conduct is ongoing; (2) HHS-OIG will be looking to see who is engaging in this improper conduct; and (3) enforcement actions will be taken if appropriate steps to cease the behavior are not immediately evident.

The AANA is aware of the significant task facing HHS-OIG in combating healthcare fraud. We and our members want to do our part and put the focus back where it should be: placing patients ahead of profits. The Company Model seems to clearly implicate the prohibitions of the AKS. The Company Model reflects circumstances where the groups controlling the referral of healthcare services seek to benefit from their "control" over the patient by profiting from the administration of anesthesia. It is time for clarity and time for this conduct to cease.

The AANA remains available to discuss this matter further, and would invite the opportunity to discuss these issues in an open forum with the goal of reducing fraud and increasing access to quality care untainted by impropriety.

Respectfully submitted,

Mark J. Silberman, Duane Morris LLP
Chair, Healthcare Fraud Audit, Compliance, and Enforcement Group

General Counsel, American Association of Nurse Anesthetists

On behalf of: **American Association of Nurse Anesthetists**
**Board of Directors, 2016**

Juan F. Quintana, DNP, MHS, CRNA, President

Cheryl L. Nimmo, DNP, MSHSA, CRNA, President-Elect

Bruce A. Weiner, MS, CRNA, Vice President

Kathryn L. Jansky, MHS, CRNA, APRN, LTC(ret), USA, Treasurer

Robert Gauvin, MS, CRNA, Director, Region 1

Debra A. Barber, DNP, MS, CRNA, Director, Region 2

Randall D. Moore II, DNP, CRNA, Director, Region 3

Mark Haffey, MSN, CRNA, APN, Director, Region 4

Alison Carter, MS, CRNA, Director, Region 5

Linda J. Goetz, MHS, CRNA, Director, Region 6

Garry J. Brydges, DNP, MSN, CRNA, ACNP-BC, Director, Region 7