# EXHIBIT 4

# COMPLAINT

OPERATING AGREEMENT
OF
NEW Anesthesiology, LLC
A Georgia Limited Liability Company

THIS OPERATING AGREEMENT (the "Agreement"), made this _____ day of _____, 2012 by CARE PLUS MANAGEMENT, LLC, a Georgia limited liability company with its principal office at 1071 Lancaster Court, Bogart, Georgia 30622, ("CPM") and Gastroenterology PC, Athens, GA ("GASTRO "), (CPM and GASTRO hereinafter referred to collectively as "Members" or individually as "Member"), to wit:

## W I T N E S S E T H:

WHEREAS, the Members formed the Company by filing its Articles of Organization pursuant to the Georgia Limited Liability Company Act;

WHEREAS, the Members desire to enter into this Operating Agreement to govern the operations and procedures of the Company;

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    <u>Definitions</u>.  All capitalized terms referenced or used in this Agreement and not specifically defined herein shall have the meaning set forth in the alphabetical listing on **Exhibit "A"** which is attached hereto and incorporated herein by reference.

1.2    <u>Construction</u>.  Whenever the context requires, the gender of all words used in this Operating Agreement includes the masculine, feminine, and neuter. All references to Articles and Sections refer to articles and sections of this Operating Agreement, and all references to Exhibits are to Exhibits attached hereto, each of which is incorporated herein by reference and made a part hereof for all purposes. The captions used herein are intended for convenience of reference only, shall not constitute any part of the Operating Agreement and shall not modify or affect in any manner the meaning or interpretation of any of the provisions of the Operating Agreement. Every covenant, term and provision of this Operating Agreement shall be construed simply according to its fair meaning and not strictly for or against any party.

## ARTICLE II
## FORMATION OF COMPANY

2.1   <u>Formation.</u>  On , 2012, the Organizer of the Company formed the Company as a Georgia Limited Liability Company by executing and delivering Articles of Organization to the Secretary of State of Georgia in accordance with the provisions of the Georgia Act.

2.2   <u>Name.</u>  The name of the Company is **NEW Anesthesiology, LLC.**

2.3   <u>Principal Place of Business.</u>  The principal place of business of the Company within the State of Georgia is 1071 Lancaster Court, Bogart, Georgia 30622.  The Company may locate its places of business and registered office at any place or places as the Manager(s) may from time to time deem advisable.

2.4   <u>Registered Office and Registered Agent.</u>  The Company's initial registered office shall be at the office of its registered agent at 1071 Lancaster Court, Bogart, Georgia 30622, and the name of its initial registered agent at such address is JOHN R. MORGAN, M.D. The registered office and registered agent may be changed from time to time by filing the address of the new registered office with the Georgia Secretary of State pursuant to the Georgia Act and the applicable rules promulgated thereunder.

2.5   <u>Term.</u>  The term of the Company shall commence on the date the Articles of Organization were filed with the Secretary of State of Georgia and shall continue thereafter until dissolved in accordance with the provisions of this Operating Agreement and the Georgia Act.

## ARTICLE III
## BUSINESS OF COMPANY

3.1   <u>Permitted Businesses.</u>  The business of the Company shall be:

(a) To provide professional anesthesiology services to ambulatory surgical centers and other medical providers (At the outset of its business, it is acknowledged by the Members that a level of uncertainty exists concerning Federal Anti-Kickback regulations, safe harbors, and safeguards in its area of practice, but the Company intend to conduct its business in a manner that does not violate the Federal Anti-Kickback Statute; therefore, whereas the Company will be providing services to patients covered by Federal health care programs from its origination, the Company will not bill any Federal health care program for services provided unless the Company is satisfied it fully meets a safe harbor or verified safeguards.);

(b) To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Georgia Act;

(c) To engage in all activities necessary, customary, convenient, or incident to any of the foregoing; and

(d) To engage in any and all other business activities legally authorized.

## ARTICLE IV
## NAMES, ADDRESSES AND MEMBERSHIP INTERESTS OF MEMBERS

The names, addresses and Membership Interests of the Members are set forth on the attached **Exhibit "B."**

## ARTICLE V
## RIGHTS AND DUTIES OF MANAGERS

5.1     Management.     The business and affairs of the Company shall be managed by its Manager(s).  Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of applicable law, the Manager(s) shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts of activities customary or incident to the management of the Company's business.  At any time when there is more than one Manager, any two Managers may take any action permitted to be taken by the Managers, unless the approval of more than two of the Managers is expressly required pursuant to this Operating Agreement or the Georgia Act.  Without limiting the generality of the foregoing, any two, but not less than two (unless there is only one Manager), of the Managers shall have authority to exercise the powers set forth in Section 5.3 below, including the power and authority to sign checks, pay bills, sign leases, receipts, repair orders and to engage in all day-to-day management activities on behalf of the Company.

5.2     Number, Tenure and Qualifications.  CPM shall initially serve as the Manager of the Company. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of Members holding at least a Majority Interest, but there shall always be at least one Manager.  Each Manager shall hold office until resignation or a successor shall have been elected and qualified in accordance with the Company's called meeting provisions.  Managers shall be elected by the affirmative vote of Members holding at least a Majority Interest.  Managers need not be residents of the State of Georgia or Members of the Company.

5.3     Certain Powers of Managers.   Without limiting the generality of Section 5.1, the Managers shall have power and authority, on behalf of the Company:

(a)   To acquire property from any Person as the Managers may determine.  The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Managers from dealing with that Person.

(b)   To borrow money for the Company from banks, other lending institutions, the Managers, Members, or affiliates of the Managers or Members on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company except by the Managers, or to the extent permitted under the Georgia Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers.  Without the unanimous consent of all Members, any loans made by any Member to the Company must be repaid over no more than a three-year period, at an interest rate of not more than ten percent (10%) per annum.

(c)   To purchase liability and other insurance to protect the Company's property and business.

(d)   To hold and own any Company real and/or personal properties in the name of the Company.

(e)   To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments.

(f)   Upon the affirmative vote of the Members holding at least a Majority Interest, to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan.

(g)   To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company, except that any expenditure in excess of $15,000 must be approved by the affirmative vote of Members holding at least a Majority Interest.

(h)   To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds.

(i)   To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Managers may approve.

(j)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Operating Agreement or by a Manager or Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

5.4    <u>Limitations on Authority.</u>   Notwithstanding any of the powers granted pursuant to Section 5.1 and 5.3 hereinabove, the Manager shall have no authority to do any act prohibited by law, nor shall the Manager have the authority to do any act which requires Member approval pursuant to Section 6.4 or 6.5 herein.

5.5    <u>Liability for Certain Acts.</u>  Each Manager shall act in a manner he or she believes in good faith to be in the best interest of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager is not liable to the Company, its Members, or other Managers for any action taken in managing the business or affairs of the Company if he or she performs the duties of his or her office in compliance with the standard contained in this Section. No Manager has guaranteed nor shall have any obligation with respect to the return of a Member's Capital Contributions or profits from the operation of the Company. No Manager shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member except loss or damage resulting from intentional misconduct or knowing violation of law, or a transaction for which such Manager received a personal benefit in violation or breach of the provisions of this Operating Agreement. Each Manager shall be entitled to rely on information, opinions, reports or statements, including, but not limited to, financial statements or other financial data prepared or presented in accordance with the provisions of O.C.G.A. §14-11-305.

5.6    <u>Managers Have No Exclusive Duty to Company.</u>  The Managers shall not be required to manage the Company as their sole and exclusive function, and all Managers may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of any Manager or to the income or proceeds derived therefrom. The Mangers, or any of them, shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture which is not directly competitive with the primary business of the Company.

5.7    <u>Bank Accounts.</u>  The Managers may from time to time open bank accounts in the name of the Company, and any one Manager or a specific individual on behalf of the Manager shall be the authorized signatory thereon, unless the Managers determine otherwise.

5.8     Indemnity of the Managers, Employees and Other Agents.  To the fullest extent permitted under O.C.G.A. §14-11-306, the Company shall indemnify the Managers and make advances for expenses to them with respect to such matters to the maximum extent permitted under applicable law.  The Company shall indemnify its employees and other agents who are not Managers to the fullest extent permitted by law, provided that such indemnification in any given situation is approved by Members owning a Majority Interest.

5.9     Resignation.  Any Manager of the Company may resign at any time by giving written notice to the Members of the Company.  The resignation of any Manager shall take effect upon receipt of notice thereof or at such later times as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.  Should the resignation of a Manager leave the Company without at least one Manager, the Members holding a Majority Interest in the Company shall serve as Manager(s) of the Company until a successor Manager is elected and qualified in accordance with the Company's called meeting provisions.

5.10    Removal.  At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by the affirmative vote of Members holding a Majority Interest.  The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.11    Vacancies.  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of Members holding a Majority Interest.  Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of Members holding a Majority Interest.

5.12    Salaries.  Not withstanding anything in this Operating Agreement to the contrary, no Manager, Member, Member of any Manager or Affiliate of any Manager or Member shall receive any salary or other compensation unless the Members by their unanimous consent determine otherwise.


### ARTICLE VI
### RIGHTS AND OBLIGATIONS OF MEMBERS

6.1     Limitation on Liability.  Each Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

6.2     No Liability for Company Obligations.  No Member will have any personal liability for any debts or losses of the Company beyond his respective initial Capital Contribution, except as provided by law.

6.3    <u>List of Members.</u>  Upon written request of any Member, the Manager(s) shall provide a list showing the names, addresses, Membership Interests and Economic Interests of all Members, Economic Interest Owners, and managers, as the case may be, as well as the other information required by O.C.G.A. §14-11-313 and maintained pursuant to Section 11.2 hereof.

6.4    <u>Approval of Certain Transactions by Majority Interest.</u>  The Members shall have the right, by the affirmative vote of Members holding at least a Majority Interest:

(a)    To approve the sale, exchange or other disposition of all, or substantially all, of the Company's assets (other than in the ordinary course of the Company's business) which is to occur as part of a single transaction or plan as provided in Section 5.3(f) herein;

(b)    To approve any expenditure in excess of $15,000 as provided in Section 5.3(g) herein;

(c)    To approve the merger of the Company with another Entity;

(d)    To elect and qualify a Manager in accordance with the Company's called meeting provisions;

(e)    To remove a Manager as provided in Section 5.10 herein; and

(f)    To fill a vacancy of a Manager as provided in Section 5.11 herein.

6.5    <u>Approval of Certain Transactions by Unanimous Approval of Members.</u>  The Members shall have the right by the affirmative vote of all the Members:

(a) To approve any loan made by any Member to the Company for a repayment period of more than three (3) years or at an interest rate of more than ten percent (10%) as provided in Section 5.3(b) herein;

(b) To approve certain salaries and other compensation as provided in Section 5.12 herein;

(c) To accept a new Member as provided in Article XII and Article XIII herein;

(d) To issue additional Membership Interests as provided in Article XIII herein;

(e) To dissolve the Company as provided in Article XIV herein; and

(f) To approve any amendment to the Operating Agreement as provided in Section 15.17 herein.

6.6     Priority and Return of Capital.  Except as may be expressly provided in Article IX, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions.   This Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

ARTICLE VII
MEETINGS OF MEMBERS

7.1     Annual Meeting.  The Members shall have no requirement but may choose to hold an annual meeting of the Members at such time and on such date as shall be determined by the Members, commencing with the year 2012, for the purpose of the transaction of such business as may come before the meeting.

7.2     Special Meetings.  Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Manager or by a Member or Members holding at least 10% of the Membership Interest.

7.3     Place of Meetings.  The Members may designate any place, either within or without the State of Georgia, as the place of meeting of the Members.  If no designation is made, or if a special meeting were otherwise called, the place of meeting shall be the principal executive office of the Company in the State of Georgia.

7.4     Notice of Meetings.  Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by regular or electronic mail, by or at the direction of the Managers or person(s) calling the meeting, to each Member entitled to vote at such meeting.  If delivered by regular mail, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at his, her, or its address as it appears on the books of the Company, with postage thereon prepaid.  If delivered by electronic mail, such notice shall be deemed to be delivered when shown as sent by an electronic mailing system to the electronic address of the Member as it appears on the books of the Company except if the sender receives a return notice from the electronic mailing system that the mail was undeliverable.

7.5     Meeting of all Members.  If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting any lawful action may be taken.

7.6     Record Date.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the

resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

7.7    Quorum.  Members holding at least a Majority Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  However, if at the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause less than a quorum to be present.

7.8    Manner of Acting.  If a quorum is present, the affirmative vote of Members holding a Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Georgia Act, by the Articles of Organization, or by this Operating Agreement.  Unless otherwise expressly provided herein or required under applicable law, Members who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Membership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

7.9    Proxies.  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting.  No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

7.10   Action by Members Without a Meeting.  Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the necessary Members entitled to vote and required to approve such action and delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records.  Action taken under this Section is effective when the Members required to approve such action have signed the consent, unless the consent specifies a different effective date.  The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

7.11 <u>Waiver of Notice.</u>  When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.


## ARTICLE VIII
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.1 <u>Members' Capital Contributions.</u>  Each Member shall contribute such amount as is set forth in **Exhibit "B"** attached hereto as its share of the Capital Contribution.

8.2 <u>Additional Contributions.</u>  Except as set forth in Section 8.1, no Member shall be required to make any Capital Contributions.  To the extent unanimously approved by the Managers, from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire, and if the Managers determine that such additional Capital Contributions are necessary or appropriate in connection with the conduct of the Company's business (including without limitation, expansion or diversification).  In such event, the Members shall have the opportunity (but not the obligation) to participate in such additional Capital Contributions on a pro rata basis in accordance with their Interests.

8.3 <u>Member Loans.</u>  Nothing in the Operating Agreement shall prohibit any Member from making a loan to the Company to fund Company operations upon mutually agreeable terms to be paid as a first priority out of Distributable Cash before any other distributions are made.


## ARTICLE IX
## DISTRIBUTIONS TO MEMBERS

9.1 <u>Distributions.</u>  All distributions of cash or other property other than distributions pursuant to Section 14.3 hereof shall be made to the Members and Economic Interest Owners pro rata in accordance with their respective Economic Interest.  Managers shall, from time to time, exercise their best efforts to distribute Distributable Cash and in all events shall distribute amounts sufficient for the Members to pay their tax liability associated with the Net Profits of the Company.

9.2 <u>Limitation Upon Distributions.</u>  Notwithstanding any other language in this Article IX, no distribution shall be made to Members if prohibited by O.C.G.A. §14-11-407.

9.3 <u>Interest On and Return of Capital Contributions.</u>  No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein.

9.4     Loans to Company.   Subject to Section 5.3(b) above, nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

9.5     Limitation Upon Liability of Manager(s).   Upon a good faith distribution of funds in the manner expressly provided in this Article IX, the Manager(s) shall incur no liability on account of such distributions, even though such distributions may result in the Company retaining insufficient funds for the operation of its business, which insufficiency may result in a loss to the Company or necessitate the borrowing of funds by the Company.

9.6     Compliance with Section 704(b) of the Code.   The provisions of this Article IX as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, shall be modified, to cause the allocations of profits, losses, income, gain and credit pursuant to Article X hereof to have substantial economic effect under the Regulations promulgated under §704(b) of the Code, in light of the distributions made pursuant to this Article and Article XIV and the Capital Contributions made pursuant to Article VIII. Notwithstanding anything herein to the contrary, this Operating Agreement shall not be construed as creating a deficit restoration obligation, or otherwise to obligate personally any Member to make a Capital Contribution in excess of the Initial Contribution as shown in Exhibit "B."

## ARTICLE X
## TAX ALLOCATIONS

10.1     Allocation of Net Profits.   Net Profits shall be allocated to and among the Members in proportion to their relative Economic Interests in the Company.

10.2     Allocation of Net Losses.   Net Losses shall be allocated in the following order of priority:

    (a)     First, to and among those Members who have positive Capital Account balances in proportion to their relative positive Capital Account balances; and

    (b)     Thereafter, to and among all Members in proportion to their relative Economic Interests in the Company.

10.3     Partial Fiscal Years.   If a Member is a Member for a period of less than a full fiscal year, the Managers shall determine whether to, at the time a new Member is admitted or an existing Member is no longer a Member, close the Company books (as though the Company's tax year has ended) or make pro rata allocations of loss, income and expense deductions to a new Member and/or prior Member for that portion of the Company's tax year in which a new Member was admitted or an existing Member is no longer a Member in accordance with the provisions of 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE XI
## BOOKS AND RECORDS

11.1    Accounting Period.  The Company's accounting period shall be the calendar year.

11.2    Records, Audits and Reports.  At the expense of the Company, the Managers shall maintain records and accounts of all operations and expenditures of the Company.  The Company shall keep at its principal place of business the following records:

   (a)    A current list of the full name and last known address of each Member, Economic Interest Owner and Manager;

   (b)    Copies of records to enable a Member to determine the relative voting rights, if any;

   (c)    A copy of the Articles of Organization of the Company and all amendments thereto;

   (d)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

   (e)    Copies of the Company's written Operating Agreement, together with any amendments thereto;

   (f)    Copies of any financial statements of the Company for the three most recent years.

11.3    Tax Returns.  The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

## ARTICLE XII
## TRANSFERABILITY

12.1    General.  Except as otherwise specifically provided herein, no Member or Economic Interest Owner shall have the right to:

   (a)    sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration, (collectively, "sell"), or

   (b)    give, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy), all or any part of its Membership Interest or Economic Interests without prior written consent of all other Members, which the other Members shall have no obligation to give.

12.2  Right of First Refusal.  (a) If at any time a Member or an Economic Interest Owner (herein called a "Transferring Owner") receives from a third party principal ("Third Party Offeror") a bona fide offer ("Third Party Offer") to purchase the Transferring Owner's Interest, the Transferring Owner may transfer the Interest, but only after the Transferring Owner shall have first offered to sell the Interest to the other Members (the "Other Members") and such offer shall not have been accepted, as provided herein.  The Transferring Owner's offer to sell the Interest to the Other Members shall be given to the Other Members and shall (i) be in writing, (ii) be accompanied by an executed copy of the Third Party Offer and a statement of the Transferring Owner that the Transferring Owner will accept the Third Party Offer if the Other Members do not purchase the Transferring Owner's Interest as provided herein, (iii) contain the name, address, and all other information about the Third Party Offeror known to the Transferring Owner, and (iv) contain an offer to sell the Interest to the Other Members at the same price and upon the same terms and conditions contained in the Third Party Offer. The Other Members shall have a period of thirty (30) days from the date of receipt of the Transferring Owner's offer within which to accept or reject the Transferring Owner's offer by giving written notice thereof to the Transferring Owner within said thirty (30) day period. The Other Member or Members who accept(s) the offer shall be obligated to purchase the entire Interest (among them in proportion to their respective Percentage Interests if more than one Other Member accepts).

(b)  If none of the Other Members elect to purchase the Interest, the Transferring Owner may make a bona fide transfer of the Interest to the Third Party Offeror within one hundred eighty (180) days following the expiration of said thirty (30) day period; provided, however, the transfer to the Third Party Offeror must be upon all of the terms and conditions of the Third Party Offer.  Upon such transfer, the Third Party Offeror shall become a Member or Economic Interest Owner, as applicable, upon the execution of such documents that the Company shall reasonably require in which the Third Party Offeror agrees to be bound by all of the terms of this Operating Agreement.  If the Transferring Owner fails to make the transfer of the Interest within said 180-day period, the right of the Transferring Owner to transfer the Interest shall expire, and the Interest shall remain subject to the restrictions of this Operating Agreement.

12.3  Option to Purchase in Certain Events.  (a) In the event of: (i) the filing by any Member or Economic Interest Owner of a petition in bankruptcy; (ii) the filing of any petition in bankruptcy against any Member or Economic Interest Owner which is not dismissed within sixty (60) days of such filing; or (iii) the transfer of the Interest of any Member or Economic Interest Owner by reason of the judgment of any court or the order of any duly authorized government authority (an "Event"), the Company shall have the option to purchase the Interest of the Member or Economic Interest Owner subject to the Event (the "Withdrawing Owner") for the "Purchase Price" (as defined below).  The Withdrawing Owner shall immediately provide written notice to the Company and all Members of an Event.  The Company shall have a period of thirty (30) days after written notification of the Event within which to exercise its option by giving written notice thereof to the Withdrawing Owner.  If the Company does not exercise its option, the

other Members (the "Other Members") shall have a period of thirty (30) days following the expiration of the Company's option period to purchase the Interest of the Withdrawing Owner. The Other Members may exercise such option by giving written notice thereof to the Withdrawing Owner. The Other Member(s) exercising such option shall be obligated to purchase the entire Interest (among them in proportion to their respective Interests if more than one Other Member exercises such option). For purposes of this Section 12.3, the Company or the Other Member(s) exercising an option to purchase is called the "Purchaser" and the Member or Economic Interest Owner who's Interest is subject to the option to purchase is called the "Seller".

(b)     The Purchase Price of the Interest shall be the Fair Market Value (FMV) of the company determined by an independent appraiser satisfactory to the Seller and the Purchaser, provided that if the Seller and Purchaser cannot agree on the selection of an independent appraiser within thirty (30) days after the Purchaser delivers Notice to the Seller of its election to purchase the Seller's interest in the Company, the Seller and Purchaser shall each select an independent appraiser within ten (10) days thereafter to perform an appraisal for the purpose of determining the FMV, such independent appraisers shall then select one additional independent appraiser to perform an appraisal to determine the FMV, and the FMV shall be deemed to be the average of the closest two appraisals (if one party fails to name its appraiser within such ten (10) day period, then the only appraiser named shall be the sole appraiser for the purposes of this definition). The determination of FMV made under this Paragraph shall be conclusive and binding upon all parties affected by said determination.

(c)     The closing shall take place on the date agreed upon by Seller and Purchaser, but in no event more than thirty (30) days after the selection of the independent appraiser(s) unless the appraiser(s) affirm(s) that he/they are unable to complete their determination of FMV within that timeframe and only under those circumstances then no more than forty-five (45) days after the selection of the independent appraiser(s).

At the closing of a purchase by the Company, a part or all of the Purchase Price, as the case may be, shall first be applied to the payment of all amounts of every nature whatsoever owed by the Seller to the Company, without regard to whether such amounts are by the terms of the evidences of indebtedness then due. The Company shall then pay the balance of the Purchase Price (the "Net Purchase Price"), if any, to the Seller for the Interest in cash, by certified check, attorney's trust account check or via wire transfer.

At the Closing of a purchase by the Other Member(s) exercising an option to purchase, such Other Member(s) shall pay the Purchase Price for the Interest in cash, by certified check, attorney trust account check or via wire transfer. However, such Other Member(s) shall, at their option, make any such payment to the Company to satisfy any indebtedness whatsoever of the Seller to the Company, without regard to whether such indebtedness is then due.

(d)   If the Purchaser acquires the Interest pursuant to the terms of this Section 12.3, the Purchaser shall use commercially reasonable efforts to obtain the release of such Seller from all contingent liabilities incurred by such Seller in connection with the business of the Company, including, but not limited to, liabilities of the Seller as a guarantor of or as a surety upon obligations of the Company to its lenders.

In the event the Purchaser is unable to obtain a release of the Seller from such contingent liabilities, the Purchaser shall indemnify and hold harmless the Seller against that portion of any such contingent liability of the Company which the Seller must pay pursuant to any personal guaranty, surety agreement or otherwise.

12.4   <u>Transferee Not Member in Absence of Unanimous Consent.</u>   (a) Notwithstanding anything contained herein to the contrary, unless all of the remaining Members approve the sale, gift, bequest or other transfer of all or any portion of the Membership Interest of a Member or Economic Interests of an Economic Interest Owner (herein called a "Transferring Owner") in advance by unanimous written consent, the purported transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be merely an Economic Interest Owner with the percentage of Economic Interests of the Transferring Owner. In such event, the Transferring Owner shall continue as a Member with the same Interest in balance at the rights associated with the Economic Interest as immediately before the transfer for the limited purpose of participating in the management of the business and affairs of the Company, subject to Section 12.4(b) below. No transfer of a Membership Interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved by unanimous written consent of the Members) shall be effective unless and until (in addition to the satisfaction of all other requirements herein) written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided to the Company and the nontransferring Member(s).

(b)   Upon and contemporaneously with any transfer of a Transferring Owner's Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interests transferred by the Transferring Owner, the Company shall purchase from the Transferring Owner, and the Transferring Owner shall immediately sell to the Company, for a purchase price of $10.00, all remaining rights and interest in the Company retained by the Transferring Owner which immediately prior to such transfer were associated with the transferred Economic Interests.

## ARTICLE XIII
## ADDITIONAL MEMBERS

From the date of the formation of the Company, any Person or Entity acceptable to the Members by their unanimous vote may become a Member of the Company either by the issuance by the

Company of Membership Interests for such consideration as approved in accordance with the provisions of this Operating Agreement, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager or Managers may, at his or their option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE XIV
### DISSOLUTION AND TERMINATION

14.1   Dissolution.

The Company shall be dissolved:

(a)   By the unanimous written agreement of all Members;

(b)   If the Company is owned exclusively by Members who are entities, upon all the Member entities being permanently dissolved by agreement, legal action, or any other enforceable means and then the interest of the Member entities shall be distributed in accordance with both the dissolution terms of the Company and the individual Member entities;

(c)   Upon Members holding a majority interest in the Company obtaining knowledge that a Member entity has undergone an ownership change such that a majority interest in the Member entity is held by any party/parties who was not a stakeholder in the Member entity on the effective date of this Operating Agreement, unless the Company approves the change by majority vote of the Members other than the effected Member entity or the Company or another Member purchases the interest of the effected Member entity in accordance with Article XII(c) and the business of the Company is continued by the consent of a Majority Interest of the remaining Member(s) within 90 days after the knowledge is obtained; or

(d)   Upon the withdrawal, removal, bankruptcy, insolvency, dissolution, death or incompetency of a Member, the sale or redemption of a Member's entire Member Interest, or the occurrence of any other event which terminates the continued membership of a Member in the Company pursuant to O.C.G.A. §14-11-601.1 or any other provision of the Georgia Act (a "Withdrawal Event"), unless the Company or another Member purchases the interest of the Withdrawing Member under the terms of Article XII(c) and the business of the Company is continued by the consent of a Majority Interest of the remaining Member(s) within 90 days after the Withdrawal Event.

    (i)    If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his interest in the Company, his estate and/or administering his property.

14.2    <u>Effect of Dissolution.</u>  Upon dissolution, the Company shall cease to carry on its business, except as permitted by O.C.G.A. §14-11-605.  Upon dissolution, the Managers shall file a statement of commencement of winding up pursuant to O.C.G.A. §14-11-606 and publish the notice permitted by O.C.G.A. §14-11-608.

14.3    <u>Winding Up, Liquidation and Distribution of Assets.</u>

    (a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager(s) shall immediately proceed to wind up the affairs of the Company.

    (b)    If the Company is dissolved and its affairs are to be wound up, the Manager(s) shall:

1.    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager(s) may determine to distribute any assets to the members in kind);

2.    Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article X hereof,

3.    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company,

4.    Distribute the remaining assets in the following order:

    (ii)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the

Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(iii)   The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed in kind being valued for this purpose at their fair market value.  Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(iv)   Any remaining funds or other assets shall be distributed to the Members and Economic Interest Owners in accordance with their Economic Interests.

c.   Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

d.   Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

e.   The Manager(s) shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

14.4   <u>Certificate of Termination.</u>  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A. §14-11-610.

14.5   <u>Return of Contribution Non-recourse to Other Members.</u>  Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

ARTICLE XV
MISCELLANEOUS PROVISIONS

15.1    Books of Account and Records.  Proper and complete records and books of account shall
be kept or shall be caused to be kept by the Managers in which shall be entered fully and
accurately all transactions and other matters relating to the Company's business in such
detail and completeness as is customary and usual for businesses of the type engaged in
by the Company.  The books and records shall at all times be maintained at the principal
executive office of the Company and shall be open to the reasonable inspection and
examination of the Members and Economic Interest Owners, or their duly authorized
representatives during reasonable business hours.

15.2    Application of Georgia Law and Venue.  This Operating Agreement, and the application
and interpretation hereof, shall be governed exclusively by its terms and by the laws of
the State of Georgia, and specifically the Georgia Act; and the Members agree that the
venue for any dispute between them under this Operating Agreement shall rest
exclusively in the Superior Court of Oconee County, Georgia.

15.3    No action for Partition.  No Member or Economic Interest Owner has any right to
maintain any action for partition with respect to the property of the Company.

15.4    Execution of Additional Instruments.  Each Member hereby agrees to execute such other
and further statements of interest and holdings, designations, powers of attorney and
other instruments necessary to comply with any laws, rules or regulations.

15.5    Construction.  Whenever the singular number is used in this Operating Agreement and
when required by the context, the same shall include the plural and vice versa, and the
masculine gender shall include the feminine and neuter genders and vice versa.

15.6    Headings.  The headings in this Operating Agreement are inserted for convenience only
and are in no way intended to describe, interpret, define, or limit the scope, extent or
intent of this Operating Agreement or any provision hereof.

15.7    Waivers.  The failure of any party to seek redress for violation of or to insist upon the
strict performance of any covenant or condition of this Operating Agreement shall not
prevent a subsequent act, which would have originally constituted a violation, from
having the effect of an original violation.

15.8    Rights and Remedies Cumulative.  The rights and remedies provided by this Operating
Agreement are cumulative and the use of any one right or remedy by any party shall not
preclude or waive the right to sue any or all other remedies.  Such rights and remedies are
given in addition to any other rights the parties may have by law, statue, ordinance or
otherwise.

15.9    Severability.  If any provision of the Operating Agreement or the application thereof to
any person or circumstance shall be invalid, illegal or unenforceable to any extent, the

remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

15.10 <u>Heirs, Successors and Assigns.</u>  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

15.11 <u>Creditors.</u>  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

15.12 <u>Counterparts.</u>  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

15.13 <u>Investment Representatives.</u>  Each Member, by its execution hereof, hereby represents and warrants that it is acquiring its interest hereunder for its own account and for investment, with no present intention of dividing its participation with other or reselling or otherwise participating, directly or indirectly, in a distribution of such interest, and that it shall not make any sale, transfer, or other disposition of such interest in violation of the Georgia Uniform Securities Act of 2008 or the Rules and Regulations promulgated thereunder, or in violation of the Securities Act of 1933, as amended, or the General Rules and Regulations promulgated thereunder by the Securities and Exchange Commission.

15.14 <u>Federal Income Tax Elections.</u>  All elections required or permitted to be made by the Company under the Code shall be made by the Managers as determined in their sole discretion.

15.15 <u>Certification of Non-Foreign Status.</u>  In order to comply with §1445 of the Code and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each Member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Treasury Regulations.  Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Managers to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

15.16 <u>Notices.</u>  Any and all notices, offers, demands or elections required or permitted to be made under this Operating Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand-delivered (either in person by the party giving such notice, or by its designated agent, or by commercial courier), (ii) on the third (3rd) business day (which term means a day when the United States Postal Service, or its legal successor ("Postal Service") is making regular deliveries of mail on all of its regularly appointed week-day rounds in Atlanta,

Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage pre-paid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth herein, or at such other address as the other party may hereafter designate by Notice, or (iii) on the third (3ʳᵈ) business day following sending by an electronic mailing system (as evidenced by electronic sent confirmation) to the electronic address of the receiving party as it appears on the books of the Company except if the sender receives a return notice from the electronic mailing system that the mail was undeliverable.

15.17   <u>Amendments.</u>   Any amendment to this Operating Agreement of Membership shall be made in writing and signed by all of the Members of the Company.

15.18   <u>Invalidity.</u>   The invalidity or unenforceability of any particular provision of this Operating Agreement shall not affect the other provisions hereof, and the Operating Agreement shall be construed in all respects as if such conflict with the provisions shall not affect or invalidate the other provisions hereof, and this Operating Agreement shall be construed in all respects as if such conflicting provision were omitted.

15.19   <u>Captions.</u>   Titles and captions are inserted for convenience only and in no way define, limit, extend or describe the scope or intent of this Operating Agreement or any of its provisions and in no way are to be construed to affect the meaning or construction of this Operating Agreement or any of its provisions.

15.20   <u>Banking.</u>   All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Managers. All funds of the Company shall be used solely for the business of the Company. All withdrawals from the Company bank accounts shall be made only upon check signed by at least two Mangers (unless there is only one Manager, in which case he or she may sign alone), or by such other persons as the Manager(s) may designate from time to time.

15.21   <u>Arbitration.</u>   Any dispute, controversy or claim arising out of or in connection with, or relating to, this Operating Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settle by, arbitration in the City of Athens, State of Georgia, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any time or at any other place or under any other form of arbitration mutually acceptable to the parties so involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of a party's counsel if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic.

15.22   <u>Determination of Matters Not Provided For In This Operating Agreement.</u>   The Manager(s) shall decide any questions arising with respect to the Company and this

Operating Agreement which are not specifically or expressly provided for in this Operating Agreement.

15.23   Further Assurances.  The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Operating Agreement.

15.24   Time.  TIME IS OF THE ESSENCE OF THIS OPERATING AGREEMENT, AND TO ANY PAYMENTS, ALLOCATIONS AND DISTRIBUTIONS SPECIFIED HEREUNDER.


[SIGNATURES ON FOLLOWING PAGE]


EXECUTED UNDER SEAL, on the ___ day of _____, 2012.


CARE PLUS MANAGEMENT, LLC


By: _____(SEAL)
        Paul Weir, Manager


GASTROENTEROLOGY  PC


By: _____(SEAL)
        , M.D.

**EXHIBIT "A"**

**DEFINITIONS**

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein);

**"Articles of Organization."**  The Articles of Organization of **NEW Anesthesiology, LLC**, as filed with the Secretary of State of Georgia as the same may be amended from time to time.

**"Affiliate."**  (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such Person; (iii) any corporation, partnership, limited liability company, trusts or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

**"Capital Account."**  A capital account maintained in accordance with the rules contained in Treas. Reg. §1.704-1(b)(2) and the applicable rules under the Code, and as set forth in Treas. Reg. §1.704-1(b)(4), as amended from time to time.

**"Capital Contribution."**  Any contribution, as defined in O.C.G.A. §14-11-101(4), to the capital of the Company in cash or property by a Member whenever made.

**"Code."**  The Internal Revenue Code of 1986, as amended from time to time.

**"Company."**  NEW Anesthesiology, LLC.

**"Distributable Cash."**  All cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders, including loans made by Members; (ii) all cash expenditures incurred incident to the normal operation of the Company's business, including salaries paid to Company employees; (iii) such amount as the Managers deem reasonably necessary to be held in escrow to provide medical malpractice tail coverage to the Company; and  (iv) such Reserves as the Managers deem reasonably necessary to the proper operation of the Company's business.

**"Economic Interest."**  A Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Georgia Act, but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

"**Economic Interest Owner.**" The owner of an Economic Interest who is not a Member.

"**Entity.**" Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"**Fiscal Year.**" The Company's fiscal year, which shall end on December 31st of each year.

"**Georgia Act.**" The Georgia Limited Liability Company Act at O.C.G.A. §14-11-100, et seq.

"**Interest.**" The entire interest of a Member or Economic Interest Owner, as applicable, in the Company.

"**Majority Interest.**" Membership Interests of Members which, taken together, exceed fifty percent (50%) of the aggregate of all Membership Interests.

"**Manager(s).**" One or more managers designated pursuant to this Operating Agreement.

"**Member.**" Each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members. To the extent a Manager has purchased a Membership Interest in the Company, he will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchases or otherwise acquired Membership Interest or Economic Interest, as the case may be.

"**Membership Interest.**" A Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act.

"**Net Losses.**" The Company's taxable losses.

"**Net Profits.**" The Company's taxable income.

"**Operating Agreement.**" This Operating Agreement as originally executed and as amended from time to time.

"**Person.**"   Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"**Reserves.**" With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"**Transferring Owner.**"  Defined as provided in Section 12.2 herein.

"**Treasury Regulations**" or "**Regulations.**"  The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

EXHIBIT "B"

INITIAL CAPITAL CONTRIBUTION

| Name/Address | Contribution | Membership Interest |
|---|---|---|
| CARE PLUS MANAGEMENT, LLC<br>1071 Lancaster Court<br>Bogart, GA 30622 | $.60 | 60% |
| Gastroenterology PC<br>3330 Ridge Rd<br>Athens, GA 30 | $.40 | 40% |

Operating Agreement
June 18, 2012